[Civ. No. 6197. Fourth Dist. Aug. 23, 1960.]

DORACE E. SCARBERY et al., Appellants, v. BILL PATCH LAND AND WATER COMPANY (a Corporation) et al., Respondents.

88

Charles E. Burch, Jr., John B. Gregory, Jennings, Engstrand & Henrikson, Paul D. Engstrand, Jr., and Robert C. Casey for Appellants.

Swing, Scharnikow & Staniforth, Swing, Scharnikow & Lewis, Charles H. Scharnikow and Douglas R. Woodworth for Respondents.

SHEA, J. pro tem.*—This case was before this court in May of 1959 on an attempted appeal from an interlocutory judgment. Because it was premature, a motion to dismiss the appeal was granted. (*Scarbery* v. *Bill Patch Land & Water Co.,* 170 Cal.App.2d 368 [338 P.2d 916].)

In the meantime, a final judgment has been entered by the trial court and the present appeal is from that judgment. By agreement of counsel the entire record in the prior appeal is incorporated by reference into this one so that all objections raised to the interlocutory judgment as well as the final judgment are before us for consideration at this time. For all practical purposes the two records constitute one appeal and they will be so treated.

The action is for declaratory relief to declare all obligations under a written contract terminated and to quiet title to real property. Mr. and Mrs. Scarbery are the plaintiffs and appellants. Mr. and Mrs. Patch, owners of the corporate defendant, and Bill Patch Land and Water Company, are the defendants and respondents. For convenience the parties will be designated as "Scarbery" and "Patch" respectively. The facts as recited herein are either uncontradicted or, where there is conflict, are viewed in the light most favorable to the respondents.

Prior to 1955 Scarbery was the owner of the San Vicente Ranch. This is the real property which is the subject of this action and appeal. The ranch is encumbered by a first deed of trust in favor of the Federal Land Bank and a second deed of trust in favor of the Mykrantz Estate. (Mrs. Mykrantz was the mother of Mrs. Scarbery and has deceased during the events herein involved.) From and after March of 1954 Patch

---

*Assigned by Chairman of Judicial Council.

was negotiating with Scarbery for the purchase of the ranch. An escrow was opened by the terms of which Patch was to exchange the equity in a building in National City, assume the encumbrances, and pay an additional $30,000 to Scarbery in payment for the ranch. During the negotiations it was discovered that the Mykrantz deed of trust contained an acceleration clause providing that, in the event of a sale by Scarbery, the entire balance of that note became due and payable. As of that time the balance on this note was $30,400. Efforts to have Mrs. Mykrantz waive the acceleration provision were unavailing. Patch was unable to pay off the balance of the Mykrantz note and, in order to avoid the acceleration clause, it became necessary to draw the agreement in a different form. This resulted in an agreement entitled "Lease and Option to Buy." This agreement was prepared by Patch and was executed by the parties on February 26, 1955. On March 19, 1955, the parties executed a "Supplemental Agreement and Modification" which reaffirmed the agreement of February 26th and made certain corrections and changes. These two documents, taken together, constitute the agreement of the parties which is the subject of this action. Throughout the agreement the parties are identified as "Optionors and Lessors" and "Optionees and Lessees."

The agreement recites that Scarbery is the owner of the ranch and that Patch had theretofore paid $4,170.40 on account of the lease and option, receipt of which is acknowledged. It then provides that on or about March 21, 1955, Patch should pay to Scarbery $4,220 to be applied to payments due on the various notes. (This figure was adjusted in the supplemental agreement to $3,547.10.) It next provides, as amended, that Patch should deliver title to a leased building in National City which building was subject to an encumbrance of $45,690.87. Receipt of assignments of the leases on said building is acknowledged by Scarbery. It is next agreed that Patch is to pay to Scarbery, during the period of the lease and option, sums sufficient to make the payments on the Federal Land Bank loan; $200 each month to be applied on the Mykrantz note; and to pay within six months an obligation owed by Scarbery to Webb Brothers in the amount of $2,208.88. As a further consideration, Patch agreed to execute a note to Scarbery secured by a second deed of trust on Patch's home ranch in Escondido. This note is for $28,000 payable within three years with interest at 6 per cent, payable monthly. This note will be referred to herein as the Scarbery note.

At the time of the execution of the agreement there were delinquent taxes owing on the ranch property in the amount of $1,858.10 which Patch agreed to pay before July 15, 1955, and he agreed to pay before final delinquent date any and all taxes as they accrued during the period of the lease and option.

Scarbery agreed to execute and deliver a deed to be placed in an escrow with instructions that the escrow holder should deliver the deed of conveyance to Patch "if, as and when the matters herein outlined shall have been faithfully performed" including the payment of the Mykrantz note in full, full payment or assumption of the Federal Land Bank note and the payment of at least $12,000 on the principal of the Scarbery note. Scarbery also agreed that as he received from Patch the payments for the Federal Land Bank and Mykrantz notes, he would promptly make these payments to the holders of the notes. He further agreed that upon the transfer of title to the National City building to him he would execute and deliver to Patch a reconveyance and full satisfaction of indebtedness on a note and deed of trust dated November 15, 1948, owing from Patch to Scarbery. (This was an obligation of $8,800 remaining from a prior transaction between the parties.)

Upon making the payments and the faithful performance of his obligations, Patch is given the right to occupy the ranch and proceed with its development and operation. Scarbery is given the right to retain occupancy of the ranch house and adjoining premises during the life of the lease and option; this occupancy to continue until six months after the payment of $12,000 on the principal of the Scarbery note.

Time is declared to be "of the essence" and the duration of the option is fixed as up to and including June 1, 1966, unless sooner terminated by the payment of the various obligations. There are other provisions, of little consequence here, for the retention by Scarbery of 87 acres of land and some stock in the Federal Land Bank.

The last paragraph in the agreement is a default provision. It provides that if Patch fails to make the payments at the time and in the manner provided, Scarbery may file a notice of default, send written notice to Patch and give Patch 30 days to remedy the default. Then if the default continues without being wholly remedied, Scarbery may bring an action to vacate the premises. If within 60 days after the filing and recording of a notice to quit all defaults have not been wholly remedied, Scarbery may remove Patch from the premises and all rights and obligations created shall cease and terminate and all sums ·

paid on account of the contract of option and lease shall be retained by Scarbery as liquidated damages. Patch shall have no right of recovery for being removed from the property and he shall be estopped to claim any further right in the property. However, if during the 30-day period of written notice and the 60 days after the recording of the notice of default, Patch makes up all payments, his rights under the contract are to be reinstated.

After the execution of the agreement Patch deeded the National City building and assigned the leases thereon to Scarbery. Patch took possession of the ranch property and commenced the operation and development of it.

Patch had previously purchased land adjoining the San Vicente Ranch which he had been and was, at the time of the execution of the agreement, developing and subdividing. After taking possession under the agreement, he extended his development program to the San Vicente Ranch property. The evidence discloses that he expended approximately $6,700 for remodeling a cottage and bunkhouse on the property; that he had extended electric lines onto the property; that he drilled and equipped a very excellent water well at a cost of approximately $10,500; that he installed pipe lines, water tanks and auxiliary equipment at a cost in excess of $20,000; that he had done extensive exploration work by digging test wells which resulted in the discovery of additional sources of water, and the disclosure of those areas where no water is available. He testified that he had spent approximately a quarter of a million dollars on capital improvements of which about $60,000 was spent in the improvement of the San Vicente Ranch property.

Up until January, 1957, Patch made all of the loan payments required by the agreement. However, he did not pay any of the taxes and he did not pay the obligation to Webb Brothers. After January, 1957, he did not make any payments to be applied on the loans. On March 22, 1957, Scarbery sent Patch a written notice of default. On April 30, 1957, two notices of default were prepared and on May 1, 1957, one was served on Patch and the other recorded in the office of the county recorder. On May 1, 1957, Patch paid Scarbery $1,000, $280 of which was applied to two months' interest on the Scarbery note and the balance was in payment of work that Scarbery had done for Patch. This paid the interest on the Scarbery note for the months of January and February, 1957. No other payments were made on the default. On July 8, 1957, the complaint in this action was filed.

The evidence shows that in November, 1956, there was a big fire in the immediate area and around the ranch property which interfered with Patch's subdivision sales program. The fire occurred just one week after Patch had made his first public offering for sale of the subdivided property. Patch testified that because of the fire, there were about 400 men and 50 pieces of equipment moved into the area where he had planned to conduct his subdivision sales and that the men and equipment remained there for about a week.

The evidence also shows from the testimony of Patch, as corroborated by his wife and his doctor, that in November, 1956, his health began to fail, that he was losing energy every day, and that it got progressively worse until July of 1957 when he was confined to a hospital in a critical condition due to ulcers and cirrhosis of the liver. Bearing on the condition of Patch's health, there was evidence that is undenied that in the latter part of 1956, after a long period of total abstinence, Patch started drinking liquor and that he was drinking excessively. His doctor testified that it is likely that his use of liquor contributed to his cirrhosis of the liver. The doctor also testified that since his hospitalization Patch had been a good patient, and that he had made a great deal of improvement and that there was nothing to indicate that Patch had been drinking since that time.

Patch testified that as a result of his illness, his income stopped because his earning capacity was dependent upon his own activity in the promotion of his business.

It is conceded that, except for the interest payment of $280 on May 1, 1957, no payments were made on any of the obligations until October 25, 1957, when Patch procured from Webb Brothers a release of the obligation owed to them by Scarbery. Scarbery was advised of this release at a meeting on October 26, 1957. At this meeting a tender was made to pay all delinquencies in order to reinstate the agreement. On October 29, 1957, a letter was sent by Patch's attorney confirming and renewing the offer and tender that had been made at the meeting. The tender was in the sum of $10,452.91 and was sufficient to pay all delinquencies, including taxes, up to October 31, 1957. In the same letter Patch agreed to stipulate to an interlocutory judgment which would provide that if there were any future defaults by Patch which were not cured within 90 days after written notice thereof, Scarbery could, without notice, apply to the court for a final judgment terminating all of Patch's right under the agreement. The tender and offer were

refused. After several continuances, the case went to trial on November 26, 1957. At the conclusion of the trial, the court gave its decision as hereinafter set forth.

In February, 1958, a hearing was had to determine the amount of attorneys' fees and the amount of the Scarbery damages. The court fixed the attorneys' fees at $14,600, appraiser's fees at $2,250, damages to Scarbery at $890.07 and costs at $215.82. On February 18, 1958, findings of fact, conclusions of law and an interlocutory judgment and decree were signed and the interlocutory judgment was entered on the same day. In due course Scarbery's motion for a new trial and a motion to vacate the interlocutory judgment were both denied. Scarbery also filed ''Plaintiffs' Objections to Purported Compliance with Interlocutory Judgment as to Escrow.'' These objections were overruled. It was at this point that Scarbery brought his former appeal which was dismissed by this court on May 14, 1958.

The findings of fact in support of the interlocutory judgment were as follows: That the agreement was entered into; that the purpose of the agreement was to ultimately effect a sale of the real property to Patch; that Scarbery had fully performed his obligations under the agreement; that Patch had conveyed the National City building to Scarbery and that Scarbery had collected rentals on this building in the net sum of $24,781.19 up to the date of trial. The court further found that Patch had paid the following sums on account of the agreement:

Payments prior to the agreement............$4,170.40
Payments on Mykrantz note.................. 6,550.00
Payments on Federal Land Bank note......... 2,952.92
Interest paid on Scarbery note............... 3,360.00

The court also found that Patch had satisfied the indebtedness owing to Webb Brothers in the amount of $2,208.88.

The court then found Patch was in default but that his failure to perform was not grossly negligent, willful or fraudulent; that Scarbery was not irreparably damaged and that any damage suffered would not be difficult to ascertain; that notices of the defaults were given in the manner required by the agreement and that the said defaults had not been cured; that on October 26, 1957, Patch had tendered sufficient sums to reinstate the agreement, which tender was refused; that the market value of the property has increased substantially and that Patch had spent substantial sums for the improvement of the property which enhanced its value.

The court then made its conclusions of law that to permit Scarbery to terminate by strict foreclosure would result in the enforcement of a penalty and forfeiture and is not in consonance with equity; that Patch should have a reasonable time to pay the sums remaining due under the agreement plus the expenses incurred by Scarbery by reason of Patch's defaults; that upon the deposit in escrow, within 45 days from the entry of the interlocutory judgment, of the sums specified in the interlocutory judgment Scarbery should forthwith deliver into the said escrow a deed together with the $28,000 note and deed of trust and an order for full reconveyance, and that Scarbery should provide Patch with a policy of title insurance. The court's next conclusion was that if Patch failed to deposit the money within the 45-day period, or such further time as the court might allow, the court may, on application of Scarbery, enter a decree quieting title to the property in Scarbery subject to a further hearing to determine all rights, duties and obligations of the parties under the agreement. The court expressly reserved jurisdiction to take further evidence, make further findings and to enter an appropriate judgment and to make such further orders as may be necessary to carry out the judgment. The court then concluded that Scarbery should be entitled to retain possession of the ranch house premises for six months after the payment of the money.

The interlocutory judgment which was entered on February 18, 1958, and modified on April 16, 1958, provided that Patch is entitled to be relieved of his defaults and to be permitted to perform the agreement by depositing in an escrow within 45 days cashier's checks or certified checks in an amount sufficient to pay all delinquencies and costs owing to Scarbery and the encumbrancers under the agreement. The items and amounts specified by the court to be paid are as follows:

| | |
|---|---:|
| County Auditor—delinquent taxes | $ 6,354.55 |
| County Auditor—current taxes | 722.14 |
| Federal Land Bank | 22,022.77 |
| Mykrantz Estate | 22,485.67 |
| Scarbery note—principal | 28,000.00 |
| Scarbery note—interest | 1,820.00 |
| Scarbery attorney's fees | 14,600.00 |
| Scarbery appraisal fees | 2,250.00 |
| Scarbery costs | 215.82 |
| Scarbery expenses | 890.07 |

Total...$99,361.02

The 45th day after the entry of the interlocutory judgment was April 4, 1958. Patch made arrangements to borrow money from a third party in order to pay the items specified in the interlocutory judgment, and on April 1, 1958, a loan escrow was opened, with a title company, between Patch and his lender. The lender deposited $125,000 in this escrow. (The $25,000 pertained to a sale of other property with which we are not concerned, so for the purposes of this case, $100,000 was deposited in this escrow.) On April 3, 1958, Patch signed supplemental instructions in the loan escrow directing the escrow holder to apply the funds in the escrow to the payment of the items specified in the interlocutory judgment, when they held a deed from Scarbery and arrangements were made for a policy of title insurance. This same day a notice that the money had been deposited with the title company and a demand for the delivery of a deed was served and filed by Patch's attorneys.

On April 4, 1958, Patch opened a second escrow in the same title company with himself and Scarbery as parties thereto and he signed instructions directing the title company to transfer from the loan escrow the amount necessary to pay all of the obligations specified in the interlocutory judgment. These instructions contained a provision that if the escrow was not completed by April 22d, Patch could demand the return of his money and close the escrow. This time was later extended to May 7, 1958. Also on April 4th, Patch signed an order in the loan escrow directing the title company to transfer $95,000 to the second escrow. The order was irrevocable. The evidence discloses that more than $5,000 of the taxes required to be paid by the interlocutory judgment were paid by Patch outside of escrow.

On April 4, 1958, the manager and vice president of the title company sent a letter to Scarbery's attorneys advising them that there had been deposited in escrow, by bank cashier's checks, sufficient funds to pay all of the items specified in the interlocutory judgment, and instructions from Patch that the title company was to apply the funds to the payment of those items. On April 7th, a letter was sent to the attorneys for Scarbery from an escrow officer in the title company enclosing a copy of the escrow instructions and requesting that the Scarbery note and deed of trust be delivered into the escrow with an order for full reconveyance.

Scarbery never deposited the deed or note into escrow. All of the funds deposited remained in escrow until November 7,

1958, at which time $5,000 was paid out of the escrow. This was the amount remaining in the loan escrow in excess of the $95,000 that had been irrevocably assigned to the second escrow. This $5,000 was paid to Patch's lender as the first payment on the $100,000 note. The $95,000 remained in the escrow.

In addition to the above mentioned $95,000, there is the sum of $32,000 which is being held in an escrow in another title company. This money is being held by the title company to secure the payment of the Scarbery note for $28,000 in order to obtain a reconveyance of Scarbery's second trust deed. This money was deposited on August 12, 1958, and has been available to satisfy the Scarbery note ever since that time.

On June 18, 1959, Scarbery filed a motion to enter final judgment quieting title to the property and to determine what unjust enrichment, if any, was due to Patch. Patch filed a counter motion for the entry of a final judgment on his behalf. It was Scarbery's contention on this motion that he was entitled to judgment for the reason that Patch had not complied with the requirements of the interlocutory judgment.

After the hearing on the motions for the entry of a final judgment, the court made additional findings of fact and conclusions of law and made and entered its final judgment on July 17, 1959. The court found that Patch had deposited in escrow sufficient sums to pay the items specified in the interlocutory judgment and that he had complied with the interlocutory judgment; that Scarbery had been timely notified by Patch and by the title company of the existence of the escrow and the deposit of the money therein; that Scarbery failed and refused to comply with the interlocutory judgment by refusing to deliver into the escrow a deed and the Scarbery note and deed of trust with an order for reconveyance; that Scarbery had filed an appeal from the interlocutory judgment and that the appeal had been dismissed; that Patch had made payment of taxes outside of escrow in the total sum of $7,596.77; that at all times since April 1, 1958, the title company had had on deposit sufficient money to pay the items specified in the interlocutory judgment; that since the filing of the action Scarbery had leased portions of the ranch and had received pasturage rentals totalling $1,074.00; and that Patch had paid all of the taxes due on the 87 acres to be retained by Scarbery.

The court then made its conclusions of law and final judgment which are substantially as follows: Patch has fully complied with the interlocutory judgment; Scarbery has not complied therewith; the amount due on the Scarbery note with interest to April 22, 1958, is the sum of $29,922.67; that the liability of Patch for the payment of interest on the Federal Land Bank note and the Mykrantz note is limited to that amount which accrued prior to April 22, 1958; that Scarbery is liable for all interest accruing on these notes after that date; that Patch is entitled to recover from Scarbery the pasturage rentals collected by Scarbery with interest from the dates that payments were received; that Patch is the owner of the subject property in fee simple and his title is quieted as against Scarbery. Scarbery is then ordered to deposit a deed into escrow and to provide Patch with a policy of title insurance as required by the agreement; that if Scarbery does not comply within 10 days, Patch is entitled to terminate the escrow and withdraw all funds on deposit therein. Title to the 87 acres retained by Scarbery is quieted in Scarbery. The judgment then provides that Scarbery shall have a lien on the ranch property to secure the payment of the Scarbery note and the payment of his award of attorney's fees, appraiser's fees, expenses and costs. This lien is to be enforceable by foreclosure as a mortgage, but Scarbery is enjoined from foreclosing such lien until he has given Patch six months' notice of his intention to comply with the provisions of the judgment. Scarbery is given the right to occupy the ranch house for one month after the date of the final judgment and, except for this occupancy, it is decreed that Patch is entitled to the immediate and exclusive possession, occupancy and use of the ranch property. There are two other provisions which are not material to this appeal.

Under the foregoing factual situation, the court is once more confronted with the problem of whether or not the trial court, in exercising its equitable jurisdiction, properly permitted Patch, who was admittedly in default, to be relieved of that default in order to avoid a forfeiture.

At the outset we are called upon to determine whether the agreement in question is a lease and option or a contract of sale. It is the contention of Scarbery that it is an option, while Patch contends that it was intended to be a contract of sale.

There have been many cases wherein the courts have been called upon to determine whether a given instrument is an option or a contract of sale. (See 32 A.L.R. 576, 87 A.L.R. 563.) Whether an instrument is an option or a sales contract is to be determined, not by its title or form but by the obligations imposed as evidenced by the terms of the instrument and the surrounding circumstances. (*Mahoney* v. *City & County of San Francisco,* 201 Cal. 248 [257 P. 49]; *McNulty* v. *Lloyd,* 149 Cal.App.2d 7 [307 P.2d 706].) In *Crowe* v. *Gary State Bank,* 123 F.2d 513 at 515, in holding that a purported option was a contract of sale, the court said:

"The rule is well established that the form and name of an instrument is not controlling, for the law looks through form to substance and gives effect to the intention of the parties."

(Also see *Marquez* v. *Cave,* 134 Kan. 374 [5 P.2d 1081].) In the case before us it is clear that the parties originally intended a purchase agreement. However, as it was finally drawn, no express obligation to buy was imposed upon Patch. For this reason Scarbery contends that the contract could not be specifically enforceable against Patch and therefore it created nothing more than an option. In support of this contention he cited, among others, the case of *People* v. *Ocean Shore R.R. Co.,* 90 Cal.App.2d 464 [203 P.2d 579]. It is true that the test of whether an instrument is an option or a contract of sale is whether there is such an obligation on the part of the optionee to buy that it can be enforced by specific performance. However, it does not necessarily follow that the agreement with which we are concerned could not be specifically enforced by Scarbery. It is pointed out in the Ocean Shore case that the question of whether or not specific performance will lie is not solely dependent upon the name or the form of the agreement but upon the intention of the parties. The court in that case carefully points out and emphasizes that unless the instrument provides that the optionee shall be relieved from any further liability other than forfeiting liquidated damages, it may be construed as a contract of purchase and sale if it is shown that such was the intention of the parties. On page 470, the court quotes from *Asia Investment Co.* v. *Levin,* 118 Wash. 620 [204 P. 808, 32 A.L.R. 578]:

" 'It is difficult to lay down a hard and fast rule which will properly classify a given contract. But the law seems

to be that, although the contract does not expressly provide that the vendee agrees to consummate the sale by paying the balance and accepting the deed, yet, where it appears that the general intention was to consummate a sale, the absence of an express agreement does not limit the contract merely to one of option, but that it will be held to be a contract of purchase and sale . . . Or, stated in the language of the decisions, where the stipulation in regard to liquidated damages is to be regarded as security for the performance of the contract by the vendee, then specific performance may be had by the vendor, but where the stipulation was intended as a substitute for performance—where the vendee might comply with the contract or pay liquidated damages in lieu thereof—then specific performance is not available.' '' (See also 87 A.L.R. 563, 567 et seq.)

In the agreement with which we are concerned there is no provision that relieves Patch of any further liability. Whether the provision for liquidated damages is regarded as security for the performance of the contract or as a substitute for performance, is a question of fact and under the circumstances of this case, a trial court might resolve that question either way. It must be made clear, however, that in this case we are not called upon to determine whether the agreement is specifically enforceable or not and nothing said in this opinion should be construed as so holding. We are merely pointing out that the contention of Scarbery that the instrument must be construed as an option because it could not be specifically enforced against Patch is a conclusion which may or may not be correct.

When the parties made their agreement they set the agreed value of the ranch at $200,000 and the agreed value of the National City building at $160,000. At the trial expert appraisers testified as to their opinion of the value of the respective properties. In an effort to show that the agreement was inequitable and unfair as to him, Scarbery offered opinion evidence to show that at the time of the agreement the value of the ranch was much greater, and the value of the National City building was much less, than the agreed value. However, appraisers also testified for Patch, and this testimony fixed the value of the ranch as of the date of the agreement at $157,000 and the value of the National City building at $150,000. Again the evidence being in conflict, it must be viewed in the light most favorable to the respondent and under this view Patch

transferred to Scarbery the National City building worth $150,000 subject to an encumbrance of $45,690.87, or a net equity of $104,309.13. He also gave the secured note for $28,000, discharged the Webb obligation for $2,208.88 and made payments on the various obligations in the total amount of $17,033.32. Thus the total value of the consideration paid by Patch on account of the agreement is $151,551.33, or more than 75 per cent of the agreed value of the ranch. Ordinarily, in a true option, the consideration given for the option is a relatively small fraction of the total purchase price. Certainly when the prospective purchaser pays more than 75 per cent on the total purchase price, it could very logically be said that the stipulation for liquidated damages was intended as security for the performance of the contract rather than a substitute for performance.

In his final reply brief, counsel for Scarbery argues strenuously that the courts are strict in holding an optionee to exact compliance with the terms of the option and that after the notices of default had been given to Patch as required by the agreement, the option was terminated and all of Patch's rights thereunder ceased to exist. In support of this contention he cites several cases which hold that when the time within which the option is to be performed, has expired the rights of the optionee are terminated. This, of course, is the law in the case of a true option but it should be pointed out that in the agreement with which we are concerned the duration of the ''option'' is up to and including June 1, 1966, thus even if the agreement is construed as an option, the *time* fixed for performance has not yet elapsed. If Patch's rights under the agreement were terminated it was not because the option period had expired but only because of his defaults.

In support of his position, counsel for Scarbery cites the case of *Hayward Lbr. & Inv. Co.* v. *Construction Products Corp.*, 117 Cal.App.2d 221 [255 P.2d 473]. In that case, on appeal, the defendant contended that the trial court should have applied the equitable principle of relief against forfeiture under section 3275 of the Civil Code. In its opinion, the court points out, at page 228, that if he intended to assert this as an equitable defense, he was required to plead facts that would justify its application, and since he had not done so, the equitable defense was not available to him. In our case, by amended and supplemental answer, such facts were fully pled and were in issue before the trial court. Thus whether the instrument be an option or a sales contract, it was entirely

proper for the court to consider the question of equitable relief from forfeiture.

We turn now to the question of whether or not this was a proper case for relief from forfeiture under sections 3275 and 3369 of the Civil Code. The contentions and arguments of Scarbery as set forth in his briefs on this appeal are numerous and lengthy. However, his basic contentions are that the evidence does not support the findings and conclusions allowing Patch to be relieved from forfeiture, and that the judgment is contrary to the law. He relies primarily upon the doctrine of the case of *Glock* v. *Howard & Wilson Colony Co.*, 123 Cal. 1 [55 P. 713, 69 Am.St.Rep. 17, 43 L.R.A. 199], and the cases which have followed the rule of that case.

Section 3275 of the Civil Code provides:

"RELIEF IN CASE OF FORFEITURE. Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty."

The pertinent portion of section 3369 of the Civil Code is as follows:

"1. Neither specific nor preventive relief can be granted to enforce a penalty or forfeiture in any case, nor to enforce a penal law, except in a case of nuisance or unfair competition."

It is conceded that by this action Scarbery is seeking to quiet title to the ranch. Such an action to terminate a contract for the sale of real property is essentially a strict foreclosure. (*Warner Bros. Co.* v. *Freud*, 138 Cal. 651 [72 P. 345].) Under the rule of the Glock case a decree quieting title in Scarbery would result in a forfeiture of Patch's interest in the ranch. As has been said many, many times, "equity abhors a forfeiture." Since equity will not enforce a forfeiture (*Keller* v. *Lewis*, 53 Cal. 113), the proper procedure in such circumstances is for the court to find the amount that is owing under the agreement, make its decree that such amount be paid within a reasonable time and that if it is not paid within that time the vendee's equity be foreclosed. (*Warner Bros. Co.* v. *Freud, supra*; *Gonzalez* v. *Hirose*, 33 Cal.2d 213 [200 P.2d 793]; *Petersen* v. *Ridenour*, 135 Cal.App.2d 720 [287 P.2d 848].) This applies even though the agreement provides that time is "of the essence." (*Barkis* v. *Scott*, 34 Cal.2d 116 [208 P.2d 367].)

In the Barkis case the Supreme Court made a very

thorough analysis of the authorities bearing on this question and at page 122 the court said:

"On the other hand, when the default has not been serious and the vendee is willing and able to continue with his performance of the contract, the vendor suffers no damage by allowing the vendee to do so. In this situation, if there has been substantial part performance or if the vendee has made substantial improvements in reliance on his contract, permitting the vendor to terminate the vendee's rights under the contract and keep the installments that have been paid can result only in the harshest sort of forfeitures. Accordingly, relief will be granted whether or not time has been made of the essence."

Scarbery contends that under the foregoing rule, equitable relief is not available in this case because the defaults were serious and that they were prolonged, willful and negligent. He points out that the default in the payment of taxes continued for two and a half years; that the default in the payment on the loans continued from January, 1957, until the date of the trial, a period of almost 11 months and that they continued for more than seven months after the notices of default had been given to Patch. He argues that under these circumstances, the rule of the Barkis case is not applicable.

While it is true that the default in this case was serious and prolonged, in balancing the equities, the degree of the default must be weighed against the degree of part performance. Where, as here, more than $150,000 had been paid on a $200,000 obligation, and in reliance on the agreement, approximately $60,000 had been spent in capital improvements to the property, the degree of part performance is so substantial that it outweighs the degree of the default. This is particularly so when the court is able to fix and award damages to the vendor for any detriment that he has suffered by the default. (*Ward* v. *Union Bond & Trust Co.*, 243 F.2d 476.)

The trial court found that the defaults were not grossly negligent, willful or fraudulent. Scarbery contends that the evidence does not support this finding. In this regard there was evidence that in October, 1956, Patch received $70,000 in cash and that this money was spent by him primarily in the subdivision project on the property that he was developing adjacent to the ranch. In October, 1956, Patch paid up some delinquent payments on the Mykrantz note in the amount of $900 but conditioned the payment on the release to him of 23 acres of the ranch property. The 23 acres were

conveyed to him by Scarbery. In January, 1958, Scarbery went to Patch and asked him to pay the delinquent taxes on the ranch and some other money that was owing to Scarbery for work that he had done for Patch. At that time Patch told Scarbery that he could not pay anything until he could "close another deal"; that he had spent all the money he had, and that he could not pay a cent because he was broke. Scarbery argues that these facts compel the conclusion that Patch was willfully in default because he had the money with which to make payments but that he applied it to other obligations rather than to the payment of the delinquent taxes. However, in the latter part of 1956 when Patch had the $70,000 and after the Mykrantz note had been brought up to date, all of the payments required by the agreement were current except the taxes. The delinquencies on the loan obligations occurred after January, 1957, and after the $70,000 had been spent. Hence, the failure to make these payments was due to inability to pay rather than a willful refusal to pay. (*Ebbert* v. *Mercantile Trust Co.*, 213 Cal. 496 [2 P.2d 776].)

As regards the delinquent taxes, there is no doubt that the default existed, but as the trial judge pointed out in his oral decision, other than the fact that Scarbery was worried and perturbed about the penalties that were accruing on the taxes, there was no showing of any actual damage to Scarbery because of this default. It is significant to note that Scarbery permitted this default to continue for over two years without taking any action. This lends an inference that Scarbery was not really concerned about the tax delinquency and that he suffered no damage because of it. It was only after the loan payments were in default that he took steps to enforce the default provisions of the agreement. At the time that he did so, Patch had no money with which to make the payments. His sales program had been disrupted by the fire and his health was failing. Although his overindulgence in liquor probably contributed to his illness, the trial judge rightly observed that this might be negligence but not gross negligence.

 Under the circumstances, the following language from *Overton* v. *Vita-Food Corp.*, 94 Cal.App.2d 367, at page 370 [210 P.2d 757] seems appropriate: "With rhythmic regularity it is necessary for us to say that where the findings are attacked for insufficiency of the evidence, our power begins and ends with a determination as to whether there is *any* substantial evidence to support them; that we have no power to judge of the effect or value of the evidence, to weigh the evidence,

to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom. No one seems to listen. We are satisfied from an examination of the voluminous transcript'' that there was ample evidence to support the finding that the defaults in this case were not grossly negligent or willful. This being the case, a court of equity not only is prevented from enforcing a forfeiture (Civ. Code, § 3369), but is required to grant relief therefrom. (Civ. Code, § 3275; *Ebbert* v. *Mercantile Trust Co., supra.*)

By its interlocutory judgment the court fixed the amount that was owing under the contract and the amount of damages that were due to Scarbery, and it gave Patch a reasonable time to pay these sums. There are numerous cases that have held that such a judgment is in accordance with the law and in consonance with equity. (*Kornblum* v. *Arthurs,* 154 Cal. 246 [97 P. 420]; *Ascherman* v. *McKee,* 143 Cal.App.2d 277 [299 P.2d 367]; *Ward* v. *Union Bond & Trust Co., supra.*)

Scarbery also contends that the most that Patch could be entitled to would be such amount as might constitute unjust enrichment (*Freedman* v. *Rector, Wardens & V. of St. Matthias Parish,* 37 Cal.2d 16 [230 P.2d 629, 31 A.L.R.2d 1]), but that under the circumstances of this case, he is not even entitled to that. In view of the fact that we have held that Patch is equitably entitled to be relieved of his default and to perform in accordance with the judgment, the matter of unjust enrichment becomes immaterial.

It is next contended that the court erred in fixing the fees for Scarbery's attorneys in the amount of $14,600. He produced as witnesses three practicing attorneys who testified that the reasonable value of the services performed is the sum of .$35,000. Mr. Burch, one of Scarbery's attorneys, testified that they had billed Scarbery for the amount of $35,000 and that Scarbery had agreed to pay them that amount as a fee. An attorney called by Patch, testified that the value of the services was $7,500. Counsel for Scarbery argues that this is not a situation wherein the court is called upon to fix a reasonable fee, but rather to determine an item of Scarbery's damage; that the amount of that damage is fixed at $35,000 because that is what Scarbery has agreed to pay. Counsel have cited no authority to support this contention and we know of none. A review of the testimony shows that each of Scarbery's witnesses on the question of the value of the services performed, testified as to what in their opinion would be a

"reasonable" fee. Thus it appears that this issue was tried on the theory of a reasonable fee, and was submitted to the court for decision on that basis. The court's ruling, having been made on conflicting evidence and being supported thereby, we are bound to sustain it.

We turn now to a consideration of whether or not Patch complied with the interlocutory judgment and whether the final judgment is supported by the evidence and in accordance with the law.

In Scarbery's opening brief on appeal from the final judgment he complains that the escrow procedures which were adopted by Patch did not comply with the provisions of the interlocutory judgment. (It is significant that there is not a single citation of any authority contained in this brief.) As hereinabove set forth, Patch was required to deposit sufficient funds in escrow to pay the obligations totalling $99,361.02. A hearing was had to determine the amount of attorneys' fees and the amount of Scarbery's damages, which hearing was concluded on February 5, 1958. The court gave its decision on these matters on February 10, 1958. The interlocutory judgment was signed and entered on February 18, 1958. On January 31, 1958, Patch had paid $2,890.63 on the taxes. Apparently this fact was not made known to the court at the time the interlocutory judgment was signed. In February he paid an additional $709.44, and on April 7, 1958, he paid the 1957-58 taxes in the amount of $1,403.92. Thus by April 7, 1958, outside of escrow, Patch had paid $5,003.99 on the total tax obligation. Since this much of the tax obligation had been satisfied, it necessarily reduced the total amount remaining due and payable on the items specified in the interlocutory judgment to the sum of $94,357.03. There was $100,000 in the loan escrow, $95,000 of which had been irrevocably assigned to the Scarbery-Patch escrow with instructions to pay all of the items specified in the interlocutory judgment. The funds on deposit were more than enough to pay all of these obligations. The trial court found that Patch had complied with the interlocutory judgment. We know of no one who is better able to determine whether or not there has been compliance with an order than the judge who made that order.

Scarbery complains that Patch performed by a "complicated mixture of various escrows" and that neither he nor his counsel were permitted to see the terms of the loan escrow until a court order was obtained in January, 1959.

The answer to this complaint seems evident. Scarbery was

notified of the escrow and the fact that the funds were on deposit with instructions to pay the items specified in the interlocutory judgment. If he had delivered a deed into the escrow and had received payment, he would have had all that he was entitled to. If he did not receive payment, then Patch would not have complied with the court's order and Scarbery would have been entitled to a final decree quieting his title to the property. In other words, if Scarbery received his money, there was compliance; if he did not, there was not compliance. The record supports the conclusion that the money would have been paid if Scarbery had performed.

Scarbery makes a further complaint that the interest provision contained in the $100,000 note which Patch executed to his lender is usurious and therefore the loan transaction is void. This may be a matter between Patch and his lender, but certainly it is of no concern to Scarbery as long as the money was available to be paid out of the escrow in satisfaction of the interlocutory judgment.

After the hearing on the motions for final judgment, there was a hearing on objections to proposed findings of fact and conclusions of law. At this hearing the court limited the liability of Patch to pay interest on the Scarbery, Mykrantz and Federal Land Bank notes to the date of April 22, 1958, and decreed that Scarbery should be liable for the interest on these notes after that date. April 22, 1958, was the date that the first notice of appeal was filed. Some of the comments of the trial court at this hearing are as follows:

"I think if they have got to pay back the penalty, I mean if they have got to pay the interest on these other obligations, such as the Mykrantz note and the Land Bank note, they have a note coming to themselves, and they get no interest on that, that that will be a sufficient penalty."

"My feeling at the time was that I thought this delay cost Patch considerable money and considerable interest, and I thought at the time that some of the delay could have been obviated very easily. And I felt they should pay a penalty for it."

"Well, that is what I was just speaking of. That is one of the penalties that the Scarberys ought to bear for their delay in this thing, so that will be disallowed."

Scarbery contends that these comments by the trial court clearly indicate that the court is imposing a penalty upon him because he exercised his right to take an appeal rather than accept the trial court's judgment. In support of this conten-

tion he cites *Wuest* v. *Wuest,* 53 Cal.App.2d 339 [127 P.2d 934], which case holds that it is wrong for the trial court to do anything that would tend to deprive a litigant of his right to appeal.

The court found that on April 22, 1958, an appeal from the interlocutory judgment was filed and then decreed that Patch is only liable for the interest on the said three notes up to April 22, 1958, and that after that date Scarbery would be obliged to pay that interest. Thus it appears from the record that the court charged the payment of interest to Scarbery effective as of the date the notice of appeal was filed and thereby imposed a penalty upon Scarbery for delaying the case.

The use of the word "penalty" and correlating it to the date that the notice of appeal was filed was most unfortunate because at first blush it seems to lend credence to Scarbery's contention. However, it should be borne in mind that Patch had deposited $100,000 in escrow and that under the original escrow instructions the final date for Scarbery to perform was also the date of April 22, 1958. When Patch placed the money in escrow and gave Scarbery until April 22d to perform, it was tantamount to a tender of the moneys owing and therefore it was proper to terminate all interest as of that date. (Civ. Code, §§ 1498, and 1504.) The inadvertent choice of words by the trial judge in making his ruling did not affect the substantial rights of the parties. (Code Civ. Proc., § 475.)

The last contention of any consequence on this appeal is that the trial court in effect rewrote the agreement of the parties by decreeing that title is vested in Patch even though he has not paid the obligations required by the interlocutory judgment and by giving Scarbery a lien against the property enforceable as a mortgage, and then providing that Scarbery must give Patch six months' notice to pay the lien. This complaint is apparently directed to paragraph 10 of the final judgment but it seems that counsel has misconstrued the language of this paragraph. A reading of the judgment shows that the court decreed, *inter alia,* that title to the ranch is vested in Patch and quieted as against Scarbery; that within 10 days Scarbery is to deliver a deed, his note and an order for full reconveyance into the escrow and make arrangements for a policy of title insurance in favor of Patch; that if Scarbery does not comply within 10 days, Patch is entitled to close the escrow and withdraw the funds on deposit. The court then decrees that Scarbery shall have the above mentioned lien and then provides that Scarbery is enjoined from foreclosing the

lien until he has given Patch six months' written notice "of their intention to comply with the provisions of this judgment." Thus the six months' period provided for in the judgment is not a six months' notice to pay but rather a six months' restraint after a notice of Scarbery's intention to comply with the final judgment. If Scarbery is willing to deposit the deed and note in escrow and make arrangements for the policy of title insurance, he is complying with the terms of the judgment and Patch is required to pay him the money due under the judgment, hence, there would be no need for any notice or foreclosure. While this is a rather anomalous provision, in view of this decision, it will be necessary for Scarbery to "comply with the provisions of this judgment" and any question concerning the lien will become moot.

The order of the trial court allowing Scarbery 30 days after date of judgment to vacate the ranch house premises was within the court's discretion under the circumstances prevailing here.

The judgment is affirmed.

Griffin, P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied September 15, 1960. Appellants' petition for a hearing by the Supreme Court and application to produce additional evidence were denied October 19, 1960.