**In re AEG ACQUISITION CORPORATION, Debtor.**

**OFFICIAL UNSECURED CREDITORS' COMMITTEE, Plaintiff,**

v.

**ZENITH PRODUCTIONS, LTD., et al., Defendant.**

**Bankruptcy No. LA 89–16455 SB. Adv. No. LA 90–0893 SB.**

United States Bankruptcy Court, C.D. California.

May 8, 1991.

Brent Whittlesey, Jones, Day, Reavis & Pogue, Los Angeles, Cal., for debtor.

Lawrence Peitzman, Morrison & Foerster, Los Angeles, Cal.

Daniel J. Bussel, O'Melveny & Myers, Los Angeles, Cal.

Jeffrey P. Meyers, Keck, Mahin & Cate, Los Angeles, Cal., for Zenith Productions, Ltd.

## AMENDED OPINION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

SAMUEL L. BUFFORD, Bankruptcy Judge.

### I. INTRODUCTION

This preference and fraudulent conveyance action presents the issue of whether the contract between the parties, relating to distribution rights in three motion picture films, is an option contract or a conditional sales contract. If it is a conditional sales contract, the Court must determine whether the creditor has duly perfected its security interest in the three films at issue.

The Court finds that the agreement is a conditional sales contract, and that the creditor has duly perfected its interest in only one of the three films. The Court further finds that the two foreign films must be registered as a condition of perfecting a security interest in them. The Court finds that the creditor has not received a fraudulent conveyance as to the perfected security interest.

### II. FACTS

AEG Acquisition Corp. ("AEG") is a Chapter 11 debtor whose principal asset is a library of copyrights, distribution rights and licenses to more than 100 motion picture films.

In 1987 Atlantic Entertainment Group, Inc. ("Atlantic"), predecessor to the debtor, entered into three distribution agreements with Zenith Productions, Ltd. ("Zenith"). These distribution agreements relate to three motion pictures entitled "Patty Hearst," "For Queen and Country," and "The Wolves of Willoughby Chase." Zenith delivered the films to Atlantic in 1987.

Atlantic failed to pay the guaranteed minimum advances under the original agreements. In September, 1988 Atlantic and Zenith entered into a series of renegotiated option contracts. At that time Atlantic executed confessions of judgment in favor of Zenith for the entire $6 million debt. As of November, 1988 Atlantic had failed to exercise any of the options under the new contracts.

In December, 1988 Zenith began negotiating with Alan Saffron, President of Kartes Video Communications, Inc. ("KVC"), whose investment group eventually acquired Atlantic (which was renamed AEG). The negotiations resulted in a third contract, a Restructuring Agreement dated February 7, 1989 ("the Agreement"). KVC was a co-obligor with Atlantic under the Agreement.

The Agreement provided for AEG to reacquire the distribution rights to the three motion pictures for $6 million. In connection with the Agreement AEG executed new confessions of judgment totalling $6 million. The Agreement states that "[u]pon payment in full to Zenith of all sums payable under Section 2 hereof, Zenith shall destroy said Confessions of Judgments Statements (sic.) and deliver the same to KVC/Atlantic." Another provision permits Zenith to enforce the confessions of judgment and exercise other remedies in the event of a default by AEG.

AEG also gave Zenith a security agreement that granted a security interest in the motion pictures, and a UCC–1 financing

statement, which Zenith filed in California, Indiana and New York. Zenith additionally recorded a copyright mortgage for each of the films with the United States Copyright Office on March 29, 1989. Shortly thereafter, on April 12, 1989, Zenith filed a certificate of copyright registration with respect to "Patty Hearst". Zenith claims that it was unnecessary to register the other two films, because they are foreign works exempt from registration pursuant to the "Berne Convention Act".

AEG made two payments to Zenith under the agreement: $250,000 on April 12 and $1.81 million on May 10, 1989. On July 28, 1989 AEG filed its chapter 11 petition. AEG subsequently filed this adversary proceeding to recover the $2,060,000 from Zenith as both preferences and fraudulent transfers pursuant to Bankruptcy Code §§ 547 and 548.

Zenith has also brought a motion to compel AEG to assume or reject the Agreement, on the grounds that it is an executory contract. AEG contends that the Agreement is not an executory contract.

### III. ANALYSIS

#### A. Preferential Transfer

■ AEG seeks to recover, as avoidable preferential transfers, the April and May payments to Zenith by AEG. Bankruptcy Code § 547(b) [1] authorizes the avoidance of a preferential transfer. The elements of a preferential transfer are:

(1) a transfer of an interest of the debtor in property;

(2) to or for the benefit of a creditor;

(3) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(4) made while the debtor was insolvent;

(5) made (A) on or within 90 days before the date of the filing of the petition; or (B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(6) that enables the creditor to receive more than the creditor would receive if (A) the case were a case under chapter 7; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent permitted by the Bankruptcy Code.

4 *Collier on Bankruptcy* ¶ 547.01 (L. King 15th ed. 1990).

Zenith defends on three grounds. First, it contends that the payments were not on account of an antecedent debt, but constituted a contemporaneous exchange. Second, it claims that it gave new value under the Agreement worth at least the amount of the payments. Third, it contends that it is secured, at least to the extent of the payments, and would have received as much under Chapter 7 as it has received from AEG.

#### 1. *Antecedent debt*

Zenith contends that the payments were not on account of an antecedent debt, because the Agreement is an option contract, and the payments were contemporaneous exchanges for specific options exercised by AEG. In consequence, it claims that AEG's payments were for the specific film rights that were released in exchange for each of the payments. AEG, in contrast, argues that the Agreement is a conditional sales contract, pursuant to which AEG's interest in the films became property of the estate upon filing of its bankruptcy peti-

---

1. 11 U.S.C.A. § 547(b) (West 1979) provides:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
 (A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
 (A) the case were a case under Chapter 7 of this title;
 (B) the transfer had not been made; and
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

tion. If the Agreement is an option contract, the remaining film rights belong to Zenith and not AEG. If it is a conditional sales contract, however, it is necessary to determine whether Zenith holds a perfected security interest in the films.

One of the features of an option contract is that the option holder has a right to exercise or to decline each option. If the holder of an option declines, it is not obligated to pay for the rights under the option. The Agreement was an option contract only if AEG could cease performance without liability at any time. "The distinguishing characteristic of an option contract," under California law, "is that it imposes no binding obligation upon the person holding the option; and where there is not merely the right, but the obligation to buy, the contract is not one of option, but of sale." *People v. Ocean Shore R. Co.*, 90 Cal.App.2d 464, 203 P.2d 579, 583 (1949).

There are several features of the Agreement that persuade the Court that it is a conditional sales contract. In addition to the Agreement, AEG executed a written security agreement, a financing statement and copyright mortgages, and Zenith recorded those documents. Although Zenith argues that the confessions of judgment and the security agreements are merely ancillary to the main agreement, the Court must consider the understanding of the parties as a whole. A security agreement and a mortgage are important documents in a conditional sale, but they have no role to play in an option contract.

Zenith had delivered all three films to Atlantic (AEG's predecessor) before the negotiation of the Agreement, and AEG received the films from its predecessor and has continued in possession thereafter. While such delivery of the films is not conclusive, it suggests that the film rights were sold, and not retained by Zenith pending payment by AEG.

The Agreement also provides that all amounts payable to Zenith immediately become due upon AEG's default. This language indicates that AEG could not escape liability should it terminate the Agreement. *See Scarbery v. Bill Patch Land & Water Co.*, 184 Cal.App.2d 87, 100, 7 Cal.Rptr. 408, 416 (1960). Such a provision has no role in an option contract, where a party may decline to continue performance at any time with no further liability.

Finally, and most importantly, the confessions of judgment cause the Agreement to be more than an option contract, because AEG was obligated to pay the $6 million even if it decided to terminate performance under the Agreement. Zenith was obligated by the Agreement to destroy the confessions of judgment only upon AEG's payment of the $6 million.

The Court concludes that the Agreement is a conditional sales or installment contract, and that the payments to Zenith were on account of an antecedent debt. Furthermore, $60,000 of the payments constituted reimbursement for Zenith's attorneys fees, and were clearly paid on account of an antecedent debt.

### 2. *New value*

■ Zenith seeks to defend the payments by asserting that it gave new value for the money in a contemporaneous exchange.[2] Zenith's theory is that AEG's predecessor had no rights whatever in the films at the time that the Agreement was negotiated, because all rights to the films had been terminated by the breach of the prior contracts. Thus, in Zenith's view, the Agreement provided AEG new rights that it did not previously possess, that were worth the $6 million that AEG agreed to pay.

The Bankruptcy Code defines "new value" as "money or money's worth in goods, services, or new credit, or release by a transferee in a transaction that is neither void nor voidable ... but does not include

---

**2.** 11 U.S.C.A. § 547(c)(1) (West 1979) states:
The trustee may not avoid under this section a transfer—
(1) to the extent that such transfer was
 (A) intended by the debtor and the creditor to or for whose benefit such transfer was

made to be a contemporaneous exchange for new value given to the debtor; and
 (B) in fact a substantially contemporaneous exchange.

an obligation substituted for an existing obligation." 11 U.S.C.A. § 547(a)(2) (West Supp.1991). According to § 547(g), Zenith bears the burden of proof on the new value defense.

The Court finds that the undisputed evidence before it does not support Zenith's new value defense. At the time of the negotiation of the Agreement Zenith held confessions of judgment that totalled more than $6 million, and Atlantic had possession of the films. The Agreement changed the amount of the debt slightly but did not disturb AEG's possession of the films. Both before and after the agreement AEG had the films and the right to exploit them, and owed AEG approximately $6 million unconditionally. As the Third Circuit has stated:

> If any amount of new value insulated a transfer from avoidance, then unsecured creditors could improve their positions on the eve of bankruptcy merely by exchanging slightly lower interest rates or altered payment schedules for security on the loan. Such a situation would dramatically hinder the goal of the preferential transfer rule.

*In re Spada,* 903 F.2d 971 (3d Cir.1990).

Although Zenith contends that AEG did not have possession of the film rights at that time, AEG has since exploited the

rights in the motion pictures, even after termination of the prior agreements.[3] The Court finds that the Agreement in substance accomplished a restructuring of the debt, and did not pass new value to AEG to support the payments to Zenith. Because of the pervasiveness of the confessions of judgment, the new value defense fails.

### 3. *Perfection*

Because the Agreement is a conditional sales contract, it is necessary to determine whether Zenith has a perfected security interest in each of the three films.[4] The Debtor's hypothetical lien creditor status entitles it to prevail over the holder of an unperfected security interest under Bankruptcy Code § 544(a).[5] The Court finds that Zenith perfected its interest in "Patty Hearst", but not in the two foreign works, "For Queen and Country" and "The Wolves of Willoughby Chase".

A security interest in a film is perfected under the United States Copyright Act, and not under the Uniform Commercial Code. *National Peregrine, Inc. v. Capitol Federal Savings & Loan (In re Peregrine Entertainment, Ltd.),* 116 B.R. 194, 198–204 (C.D.Cal.1990). The Copyright Act preempts the UCC for security interests in films. *Id.* Thus Zenith's filing of its UCC–1 gave it no assistance in per-

---

**3.** For example, during the course of the bankruptcy Zenith attempted to obtain a temporary restraining order to prevent Showtime from airing "Patty Hearst" after Showtime had entered into an agreement with AEG for its showing.

**4.** Zenith argues that its security interest is not limited to the copyright in the three films, but extends also to the prints of the films, contract and distribution rights, and to accounts relating thereto. The Court has not been made aware of any such interests that are not integral to the copyrights themselves. *Cf. National Peregrine, Inc. v. Capitol Federal Savings & Loan (In re Peregrine Entertainment, Ltd.),* 116 B.R. 194, 207 n. 20 (C.D.Cal.1990). Insofar as there are any such interests, the Court directs that the parties so inform the Court seven days before the June 4, 1991 hearing set *infra.*

**5.** 11 U.S.C.A. § 544(a) (West Supp.1991) provides:

> The trustee shall have, as of the commencement of the case, and without regard to any

knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

> (1) a creditor that extends credit to the debtor at the time of the commencement of the case and that obtains, at such time and with respect to such credit, a judicial lien on all property of which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

> (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

> (3) a bona fide purchaser of real property ... from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

fecting its security interest in these motion pictures.

Perfection of a security interest in a motion picture, as in any copyright, requires two steps: the film must be registered with the United States Copyright Office, and the security interest must be recorded in the same office. Registration of a copyright is accomplished by the submission of an application to the copyright office together with a nominal filing fee and one or two copies of the work to be copyrighted. 17 U.S.C.A. § 408 (West 1977 & Supp.1991); *see generally* 1 P. Goldstein, *Copyright* ¶ 3.12 (1989).

■ Recordation of a security interest is also accomplished through the Copyright Office. The Copyright Act states, "any transfer of copyright ownership or other document pertaining to a copyright" may be recorded in the United States Copyright Office. 17 U.S.C.A. § 205(a) (West 1977). Section 205(c) further provides that recordation acts as constructive notice of the facts stated in the document if the document specifies the work and if registration has been made for the work.[6] The first to execute in compliance with § 205(c) prevails when conflicting transfers arise. 17 U.S.C.A. § 205(d) (West Supp.1991).[7] The filing of a copyright mortgage with the United States Copyright Office constitutes perfection of the security interest as long as an underlying registration is also filed with the Office. *Peregrine Entertainment* at 200; *see generally* Note, *Transfers of Copyrights for Security Under the New Copyright Act*, 88 Yale L.J. 125 (1978).

### a. "Patty Hearst"

■ It is undisputed that Zenith registered the film "Patty Hearst" on April 12, 1989, which was more than 90 days before the filing of this bankruptcy case. Zenith recorded its mortgage on March 29, 1989, 14 days prior to the registration.[8] Zenith's security interest in "Patty Hearst" was thus perfected at the time of the bankruptcy filing, and outside the 90-day preference period.

AEG has not attacked this registration and recordation as a preference to an insider. Thus the Court assumes that Zenith's security interest in "Patty Hearst" is valid.

### b. Foreign films

#### i. Perfection

■ Zenith argues that the two foreign films are governed by the "Berne Convention Act", and that registration of the underlying works is not a prerequisite to perfection of its security interests. Presumably Zenith intends to refer to the Berne

---

**6.** 17 U.S.C.A. § 205(c) (West 1977) provides:
Recordation of a document in the Copyright Office gives all persons constructive notice of the facts stated in the recorded document, but only if—
(1) the document, or material attached to it, specifically identifies the work to which it pertains so that, after the document is indexed by the Register of Copyrights, it would be revealed by a reasonable search under the title of registration number of the work; and
(2) registration has been made for the work.

**7.** 17 U.S.C.A. § 205(d) (West Supp.1991) provides:
**Priority Between Conflicting Transfers.**—As between two conflicting transfers, the one executed first prevails if it is recorded, in the manner required to give constructive notice under subsction (c) ... at any time before recordation in such manner of the later transfer. Otherwise the later transfer prevails if recorded first in such manner, and if taken in good faith, for valuable consideration ... and without notice of the earlier transfer.

**8.** Neither party has raised the issue of whether recordation of a copyright mortgage is valid if it is recorded before the registration of the underlying copyright. *See* Note, *Transfers of Copyrights for Security Under the New Copyright Act*, 88 Yale L.J. 125, 130–32 (1978) (secured party who records prior to registration of copyright cannot be certain of priority). The Court notes that the recordation statute is modeled on real property recording acts, and that it is a "race-notice" type of statute. On real property recordation acts, *see generally Walker v. California Mortgage Service (In re Walker)*, 67 B.R. 811, 814 (Bankr.C.D.Cal.1986), *aff'd*, 861 F.2d 597 (9th Cir.1988); J. Cribbett, *Principles of the Law of Property* 285 (1975); L. Simes, *A Handbook for More Efficient Conveyancing* 18–31 (1961); 4 *American Law of Property* §§ 7.4–17.36 (Casner ed.1952); R. Patton & C. Patton, *Patton on Land Titles* 28–45 (2d ed.1957). A mortgage on real property that is recorded outside of the chain of title would not be effective. *See e.g. Cribbett*, at 290–293. The Court does not address this issue for copyrights.

Convention for the Protection of Literary and Artistic Works (Paris Text, 1971) ("Berne Convention"). The Court disagrees and concludes that registration is required to perfect a security interest in a foreign film.

One of the principal substantive provisions of the Berne Convention is its provision that authors enjoy the same protection in any member country as the nationals of that country. Berne Convention, art. 5(1). The Convention provides certain rights superior to national law, however, which notably include the right to copyright protection without complying with any formalities. *Id.*, art. 5(2). If this provision were applicable without restriction in the United States, Zenith might prevail in its argument that registration is not required as a condition for the perfection of a security interest in a foreign work.

Article VI of the United States Constitution provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land...." It is presumably under this constitutional provision that Zenith argues that the Berne Convention excuses it from registering its copyrights in the foreign films as a condition of perfecting its security interests. However, United States law on treaties is more complex.

 Some treaties are self-executing, under United States treaty law, and some are not. A self-executing treaty creates rights for the nationals of a country that is a party to the convention without the need for any implementing domestic legislation. *Restatement (Third) of Foreign Relations Law of the United States* § 111. A treaty that is not self-executing, on the other hand, requires implementing domestic legislation to create rights thereunder for the citizens of the state party to the treaty. *Id.* Whether a particular treaty is self-executing or not normally turns on the domestic law of the particular state party, and may vary from one state party to another. *Id.*, comment *h.*

 At the time that it ratified the Berne Convention, the United States Senate determined that the treaty should not be self-executing in the United States, and Congress enacted implementing legislation to give it effect in the United States. Pub.L. No. 100–568 §§ 2, 3, 102 Stat. 2853–2854 (Oct. 31, 1988). Thus the Berne Convention creates rights in United States law only to the extent that it is implemented through domestic legislation. The language of the convention alone does not excuse Zenith from complying with United States law to preserve its rights as a secured creditor in the foreign films here at issue, except to the extent that internal United States law so provides.

Section 411 is specific in providing rights under the Berne Convention without further compliance with United States law. It permits "actions of *infringement* of copyright in Berne Convention works" without registration. 17 U.S.C.A. § 411(a) (West 1977 & Supp.1991) (emphasis added). United States copyright law provides no other Berne Convention exemption, however, from complying with the registration provisions. Thus Zenith is required to comply with domestic United States law to perfect its security interest in these films. Additionally, section 205, which deals specifically with transfers, does not distinguish between foreign and domestic works. Since Zenith did not register the underlying foreign films, third parties were not put on notice of the copyright mortgages for the foreign films, and Zenith's interests remained unperfected.

### ii. Debtor's status

 Zenith argues that it is entitled to prevail even if its lien on the foreign films is unperfected. Zenith contends that a judgment lien does not prevail over an unperfected security interest in copyrights, and that AEG's hypothetical lien creditor status under section 544(a)(1) gives it no better rights. If, under the applicable law, a judicial lien creditor would prevail over the holder of an unrecorded lien, the debtor in possession prevails; if not, not. *Angeles Real Estate Co. v. Kerxton (In re Con-*

*struction General Inc.)*, 737 F.2d 416, 418 (4th Cir.1984); *Peregrine Entertainment, supra,* at 204–205.

Zenith concedes that a judicial lien constitutes a "transfer" within the meaning of section 205(d). *Accord, Peregrine Entertainment, supra,* at 206. Furthermore, the debtor is assumed to have completed all steps necessary to create the lien as of the date of filing of the bankruptcy case. 4 *Collier on Bankruptcy* ¶ 544.02 (King 15th ed.1991); 2 W. Norton, *Bankruptcy Law and Practice* § 30.04 (1990).

■ Zenith's argument fails because it ignores the differences in the language of the various perfection statutes. The status of a lien creditor is determined by the specific language of the particular statute at issue.

■ The California recording statute for real property protects only a "purchaser or mortgagee", and not a lien creditor. For this reason lien creditors are subordinate to holders of unrecorded interests in real property in California.[9] *See Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1401 n. 4 (9th Cir.1984); *20th Century Plumbing Co. v. Sfregola*, 126 Cal.App.3d 851, 854, 179 Cal.Rptr. 144 (1981). The Uniform Commercial Code, in contrast, gives lien creditors priority over holders of unrecorded security interests. UCC § 9–301(1)(b) (1990).

■ Bankruptcy Code § 544(a)(3)[10] gives a trustee or debtor in possession the status of a hypothetical bona fide purchaser of real property who has perfected at the date of filing of the bankruptcy petition, because under state recording acts such a purchaser cannot defeat the interests of a prior perfected interest holder in the property. The Code does not give a trustee or debtor in possession such status for personal property, because such a purchaser *would* prevail over a duly perfected lien creditor for much personal property. UCC § 9–307 (1990). To protect creditors whose security interests in personal property are duly perfected, the Code gives a trustee or debtor in possession only the status of a lien creditor, not a bona fide purchaser.

Unlike the UCC, the copyright statute does not permit a bona fide purchaser to prime a perfected security interest holder. At the same time, section 205(d) gives priority to any "transfer" that is recorded first, if it is taken (1) in good faith, (2) for valuable consideration, and (3) without notice of the prior unrecorded interest. Section 544(a) gives statutory satisfaction to a trustee or debtor in possession for the conditions of valuable consideration and lack of notice.

■ The meaning of "good faith" in section 205(d) is not clear. In a race-notice real estate recording act, such as that in California, it means lack of notice of a prior unrecorded interest. *See Walker v. California Mortgage Service (In re Walker)*, 67 B.R. 811, 814 (Bankr.C.D.Cal.1986), *aff'd,* 861 F.2d 597 (9th Cir.1988). Given this meaning, "good faith" would duplicate the third requirement, and would not provide a separate condition for priority.

Alternatively, the holder in due course definition of the UCC protects a holder of an instrument who takes it for value, in good faith, and without notice of certain defenses. UCC § 3–302(a) (1990). "Good faith" is defined in the UCC to mean, "honesty in fact in the conduct or transaction concerned." UCC § 1–201(19) (1990).

■ The Court finds that the UCC meaning of "good faith" is the preferable interpretation of section 205(e). Thus a later transfer of an interest in a copyright qualifies for priority only if the transferee has been honest in fact in the transaction at issue, and has also met each of the other

---

**9.** The protection of unrecorded real property interests varies from state to state. In North Carolina, for instance, which has a "race" recording act, lien creditors are given statutory priority over unrecorded interest holders. *See* N.C.Gen.Stat. § 47–18(a) (1990). Similarly, in Massachusetts, which has a "notice" recording statute, an unrecorded interest in real property is invalid against "any person" lacking notice of it. Mass.Gen.Laws Ann. c. 183, § 4 (1990).

**10.** For the text of section 544(a)(3) see footnote 5, *supra.*

qualifications. AEG meets this good faith qualification in this case.

Thus, the Court finds that AEG is entitled to set aside Zenith's unrecorded security interest in the two foreign films.

### 4. *Benefit to Insider*

 AEG contends that the April 12, 1989 transfer of $250,000 is recoverable, even though it was made more than 90 days before the filing of its bankruptcy case, because the payment benefitted AEG's affiliate KVC, an undisputed insider, which was jointly and severally liable to Zenith on the debt. The preference recovery period for outside creditors is one year when payment produces benefit for an inside creditor. *Ray v. City Bank & Trust Co. (In re C–L Cartage Co.)*, 899 F.2d 1490 (6th Cir.1990); *Manufacturers Hanover Leasing Corp. v. Lowrey (In re Robinson Brothers Drilling, Inc.)*, 892 F.2d 850 (10th Cir.1989); *Levit v. Ingersoll Rand Financial Corp.*, 874 F.2d 1186 (7th Cir.1989); *see, also Cambridge Meridian Group, Inc. v. Connecticut National Bank (In re Erin Food Services, Inc.)*, 117 B.R. 21 (Bankr.D. Mass.1990).

Zenith makes three arguments against the application of the *Levit* line of authority to the $250,000 transfer in this case. First, it argues that section 547 does not presume insolvency during the extended preference period, and that AEG has not shown that it was insolvent at the time of the transaction. However, Zenith ignores the declaration of AEG's president Alan Safron, to which it has not objected, which states that AEG was insolvent at the relevant time. Because Zenith has offered no contrary evidence, the Court finds that AEG has carried its burden on this issue.

Second, Zenith argues that the Court should not apply the *Levit* line of authority

because it is controversial and has not been followed by other courts. However, *Levit* has been followed by two other circuits since its issuance, and Zenith has cited no opinion of a court at any level after *Levit* that has disagreed with it. The Court declines Zenith's invitation to be the first to disagree with the authority of these three circuits.

Third, Zenith argues that the *Levit* rule should not be applied where the party benefited is a co-obligor, and not a guarantor, as in the *Levit* case. While both *Levit* and *Robinson Brothers Drilling* involved guarantors, in *C–L Cartage* the insiders were the principal obligors on the debt that gave rise to the preferential transfer, although they had a claim against the debtor because the debts at issue were incurred to provide funds for the debtor. In this case it appears, from the evidence before the Court, that KVC was a related corporation whose only role in the transaction was to guarantee payment of the debt at issue.

Thus the Court finds that the *Levit* rule applies, and that the $250,000 payment is also avoidable as a preferential transfer.

### B. Executory Contract

 The parties disagree on whether the Agreement is executory or non-executory. If the Agreement is executory, AEG must either assume or reject the contract, pursuant to Bankruptcy Code § 365, prior to confirmation of the plan of reorganization. The conditions of the assumption of an executory contract include (1) the cure of any default, or the provision of adequate assurance of a prompt cure thereof; (2) compensation (or adequate assurance of prompt compensation) for any actual pecuniary loss resulting from default; and (3) adequate assurance of future performance under the contract. Bankruptcy Code § 365(b)(1).[11] Zenith is hoping at

---

**11.** 11 U.S.C.A. § 365(b)(1) (West Supp.1991) provides:

If there has been a default in an executory contract ... of the debtor, the trustee may not assume such contract ... unless, at the time of assumption of such contract ... the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract ... for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such contract....

least to obtain immediate payment of its claim under this provision as a condition of AEG's retention of the distribution rights to the films. If the Agreement qualfies as an executory contract, Zenith is entitled to such priority payment as a condition of assumption.

■ The Court concludes that the Agreement is not an executory contract. The Court has found that the Agreement is a conditional sales contract. Essentially Zenith's only remaining obligations under the Agreement are those of a secured or unsecured creditor. Where the seller has already delivered the subject of the transfer, and the principal remaining obligation between the parties is the purchaser's obligation to pay, a contract is not executory. *Pacific Express, Inc. v. Teknekron Info-switch Corp. (In re Pacific Express, Inc.)*, 780 F.2d 1482, 1487 (9th Cir.1986).

### C. Fraudulent Conveyance

AEG also attacks the payments to Zenith as fraudulent conveyances. To the extent that the payments are on account of Zenith's secured debt, they are not vulnerable to a fraudulent conveyance attack. To the extent that they are on account of any unsecured debt owing to Zenith, they are recoverable as preferential transfers. Thus the Court does not need to address this issue separately.

### IV. CONCLUSION

For the foregoing reasons the Court grants partial summary judgment to AEG, and partial summary judgment to Zenith. The Court sets a further hearing on June 4, 1991 at 2:00 p.m. on the valuation of Zenith's security interest in the rights to the motion picture "Patty Hearst", and the extent to which the payments here at issue were on account of that secured debt.