**In re AEG ACQUISITION CORP., Debtor.**

**ZENITH PRODUCTIONS, LTD., Appellant,**

**v.**

**AEG ACQUISITION CORP.; Official Committee of Creditors Holding Unsecured Claims, Appellees.**

**BAP No. CC–92–1036–JMeO.**
**Bankruptcy No. LA89–16455–SB.**
**Adv. No. AD90–00893–SB.**

United States Bankruptcy Appellate Panel, Ninth Circuit.

Argued and Submitted Oct. 21, 1992.

Opinion Nov. 5, 1993.

Amended Opinion Nov. 30, 1993.

Jeffrey P. Meyer, Los Angeles, CA, for appellant.

Garrett L. Hanken, Los Angeles, CA, for appellees.

Before: JONES, MEYERS and OLLASON, Bankruptcy Judges.

## AMENDED OPINION[1]

JONES, Bankruptcy Judge:

### FACTS

AEG Acquisition Corp. ("AEG") is a debtor under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101–1174,[2] whose princi-

---

**1.** Pursuant to the appellee's petition for rehearing, the panel files this Amended Opinion which corrects certain technical inaccuracies. An Amended Judgment shall be issued simultaneously with the filing of the Amended Opinion.

**2.** Unless otherwise indicated, all references to sections or Chapters are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and all references to rules are to the Federal Rules of Bankruptcy Procedure, Fed.R.Bankr.P. 1001–9035.

pal asset is a library of copyrights, distribution rights and licenses to more than 100 motion pictures. In 1987, Atlantic Entertainment Group, Inc. ("Atlantic"), AEG's predecessor, entered into three distribution agreements ("1987 Agreements") with Zenith Productions, Ltd. ("Zenith"). The 1987 Agreements relate to three motion pictures entitled "Patty Hearst," "For Queen and Country," and "The Wolves of Willoughby Chase" ("Films"). Zenith delivered the Films to Atlantic in 1987, but Atlantic failed to pay guaranteed minimum advances totalling $6 million as provided for by the 1987 Agreements.

In September, 1988, Atlantic and Zenith entered into a series of option contracts which stated that Atlantic had no distribution rights in the films, but that it could purchase the distribution rights for $6 million until November 15, 1988. The option contracts also required Atlantic to execute confessions of judgment in favor of Zenith for the entire $6 million owed under the 1987 Agreements. Atlantic failed to exercise the options by the specified date.

In December, 1988, Zenith began negotiating with Alan Saffron, President of Kartes Video Communications, Inc. ("KVC"), whose investment group eventually acquired Atlantic (which was renamed AEG). The negotiations resulted in a third contract, a Restructuring Agreement dated February 7, 1989 ("Restructuring Agreement").

The Restructuring Agreement called for AEG to purchase distribution rights for the Films in the United States and Canada in perpetuity. The purchase price for these rights was $6 million which was to be paid in six $1 million installments. The Restructuring Agreement also required AEG to pay the attorney's fees incurred by Zenith in the litigation and negotiations concerning the Films. The Restructuring Agreement provided that AEG was to receive a bundle of distribution rights in return for each $1 million installment[3] until, after paying the sixth installment, it would own all the distribution rights for the Films in the United States and Canada. The Restructuring Agreement required AEG and KVC to execute new confessions of judgment totalling $6 million, but further provided that upon payment of the purchase price, the confessions of judgment would be destroyed. In the event of default by AEG (including failure to purchase the distribution rights), Zenith could enforce the confessions of judgment and exercise other remedies.

Pursuant to the Restructuring Agreement, AEG gave Zenith a security agreement granting a security interest in all of AEG's interest in the Films. To perfect its security interest, Zenith filed financing statements in California, Indiana and New York, recorded a copyright mortgage for each of the Films with the United States Copyright Office, and filed a certificate of copyright registration with respect to "Patty Hearst." Zenith did not file such a certificate with respect to the other two Films because they were foreign works which Zenith believed were exempt from registration.

On April 12, 1989, AEG paid Zenith $250,000 and on May 10, 1989, it paid Zenith another $1,810,000.[4] These sums appear to represent the first purchase price installments and a partial payment of Zenith's attorney's fees.

On July 12, 1989, AEG filed its Chapter 11 petition. AEG subsequently filed an adversary proceeding to recover the two payments from Zenith as preferences and as fraudulent transfers pursuant to Bankruptcy Code §§ 547 and 548.[5] Zenith, meanwhile, brought a motion to compel AEG to assume or reject the Restructuring Agreement on the grounds that it was an executory contract.

---

3. For instance, upon making the first $1 million payment, the Agreement provided that AEG was to receive "the right to distribute and exhibit 'For Queen and Country' theatrically and nontheatrically."

4. The ninetieth day before AEG filed bankruptcy was April 16, 1989. Thus, the $250,000 payment was outside that period while the $1,810,000 payment was within it.

5. The official unsecured creditors' committee is also a party to the adversary proceeding and to this appeal. It is unclear from the record, however, whether the committee was originally a party to the action.

After arguments on cross-motions for summary judgment and on the motion to compel assumption or rejection, the court issued a published decision, *In re AEG Acquisition Corp.,* 127 B.R. 34 (Bankr.C.D.Cal.1991), in which it held: (1) That the $1,810,000 payment was a preference; (2) that the $250,000 payment was a preference (even though it was made more than 90 days prepetition) because the payment benefitted KVC, an insider of AEG; (3) that Zenith's security interests in the foreign Films were avoidable under Bankruptcy Code § 544(a) because they were not perfected when AEG filed bankruptcy; and (4) that Zenith's security interest in "Patty" was perfected when AEG filed bankruptcy because Zenith had registered that film and recorded its copyright mortgage with the copyright office.

The court later allowed AEG to amend its complaint to add a cause of action to avoid the security interests as preferences. In this cause of action, AEG alleged that if the security interests were perfected at all, perfection occurred more than 10 days after AEG incurred the debt to Zenith and within the 90–day preference period. They were thus preferences and were not protected by the 10–day grace period created by Bankruptcy Code § 547(e)(2). On December 31, 1991, the court held for AEG on the latter cause of action, and entered a judgment in favor of AEG for $2,060,000 plus interest and costs.

Zenith timely appealed.

## ISSUES

A. Whether the trial court correctly held that AEG's payments to Zenith were preferences.

B. Whether the trial court correctly held that the security interests AEG granted to Zenith were preferences.

C. Whether the trial court correctly held that Zenith failed to give new value for the payments and the security interests.

D. Whether the trial court correctly applied Bankruptcy Code § 547(e)(2) to conclude that the security interests were given on account of an antecedent debt.

E. Whether the trial court properly concluded that the Restructuring Agreement was not an executory contract.

## STANDARD OF REVIEW

We review the trial court's grant of a motion for summary judgment *de novo. See In re Baird,* 114 B.R. 198, 201 (9th Cir. BAP 1990). Whether the Restructuring Agreement is an executory contract is an issue of law that we review *de novo. See In re Wegner,* 839 F.2d 533, 536 (9th Cir.1988).

## DISCUSSION

### A. The Payments as Preferences

Five elements must be present for a transfer to be a preference. The transfer must "(1) benefit a creditor; (2) be on account of an antecedent debt; (3) be made while the debtor was insolvent; (4) be [made] within 90 days before the bankruptcy; and (5) enable the creditor to receive a larger share of the estate than if the transfer had not been made." *Union Bank v. Wolas,* —— U.S. ——, ——–——, 112 S.Ct. 527, 529–530, 116 L.Ed.2d 514 (1991). The trustee or debtor in possession bears the burden of proving these elements, 11 U.S.C. § 547(g), but the debtor is presumed insolvent during the 90 days immediately preceding the petition, 11 U.S.C. § 547(f). The preference period is extended to one year before the bankruptcy if the transfer is to an insider. 11 U.S.C. § 547(b)(4)(B).

In the case at bar, there is no dispute that the payments made by AEG benefitted Zenith. Zenith disputes the existence of the remaining elements, however. We address each element in order.

### 1. Antecedent Debt

Zenith argues that the second element of a preference is absent because the Restructuring Agreement is an option contract under which AEG had the right, but not the obligation, to purchase six bundles of distribution rights for $1 million each. According to Zenith's reading of the Restructuring Agreement, there was no existing debt when AEG made the payments to it, so the

payments could not be on account of an antecedent debt.

"The distinguishing characteristic of an option contract is that it imposes no binding obligation upon the person holding the option; and where there is not merely the right but the obligation to buy the contract is not one of option but of sale." *People v. Ocean Shore R.R. Co.*, 90 Cal.App.2d 464, 470, 203 P.2d 579, 583 (1949). The Restructuring Agreement is not an option because it did not merely allow AEG to purchase the Film rights, but obligated it to do so. The Restructuring Agreement (1) states that AEG "hereby agrees" to pay Zenith $6 million in six installments, as well as certain other sums;[6] (2) requires AEG to assume the $6 million Atlantic debt to Zenith arising from the breach of the 1987 Agreement; and (3) requires AEG and KVC to execute confessions of judgment for that amount. Because the Restructuring Agreement did not merely give AEG the option to purchase the film rights, but required it to do so, the Restructuring Agreement is not an option contract.

The trial court concluded that the Restructuring Agreement was a conditional sale contract which restructured the debt owing to Zenith arising from Atlantic's breach of the 1987 Agreement. This interpretation of the Restructuring Agreement makes sense in terms of the history of the transactions between Zenith and AEG and its predecessors, and in terms of the language of the Restructuring Agreement.

AEG's predecessor, Atlantic, breached its agreement to purchase the Films and, as a result, owed Zenith $6 million in damages. Zenith then gave Atlantic another chance to purchase the Films for $6 million which Atlantic failed to do. When AEG agreed to purchase the Films, Zenith wanted to ensure that either the sale would close or it would readily be able to collect the $6 million. The Restructuring Agreement thus provides for payment of the $6 million and Zenith's attorney's fees and other costs. This history of dealings between the parties makes clear that Zenith was owed the $6 million and the Restructuring Agreement was another means of trying to collect it.

The Restructuring Agreement, meanwhile, provides for the retention by Zenith of all "right, title and interest" in the Films pending payment of the purchase price. It also requires AEG to give Zenith a security interest in the Films and to execute confessions of judgment. Upon payment of the full $6 million purchase price, AEG would own all the rights in the Films and the confessions of judgment would be destroyed.

Zenith argues that the sales of bundles of rights for $1 million each belies the assertion that the Restructuring Agreement is a conditional sales contract. This argument elevates form over substance. The Restructuring Agreement provides for the sale of distribution rights in the Films for $6 million. Zenith's artful attempt to draft the Agreement as sales of individual bundles of rights cannot turn the Agreement into something it is not. We therefore agree with the trial court that the Restructuring Agreement is a conditional sales contract. AEG thus became liable to Zenith for the $6 million when the Restructuring Agreement was executed and its payments to Zenith were on account of this antecedent debt.

## 2. Solvency of AEG When the Payments Were Made

■ Zenith raises the issue of AEG's insolvency for the first time on appeal. Insolvency is a factual issue. *See In re Koubourlis*, 869 F.2d 1319, 1322 (9th Cir.1989); *In re Sierra Steel, Inc.* 96 B.R. 275, 277 (9th Cir. BAP 1989). Development of the record on this essential element of a preference is therefore important. Yet, because of Zenith's failure to raise this issue, almost no evidence is in the record and the trial court made no finding regarding AEG's solvency during the relevant periods.

■ Moreover, we normally will not consider a new issue on appeal absent extraordi-

---

**6.** This mandatory language may be contrasted with the language used in the Option Agreements: "[In return for certain consideration,] Zenith hereby grants to Atlantic an option ... to acquire those distribution rights...." Such language is indicative of a true option and demonstrates that Zenith knew how to grant an option.

nary circumstances. *United States v. Oregon,* 769 F.2d 1410, 1414 (9th Cir.1985). We are especially reluctant to consider a new issue on appeal where the issue does not involve a "pure" question of law. *See Telco Leasing, Inc. v. Transwestern Title Co.,* 630 F.2d 691, 693 (9th Cir.1980). Zenith points to nothing that might constitute a compelling reason or "extraordinary circumstances" justifying its failure to challenge this essential element of AEG's case. We thus decline to consider the issue of insolvency for the first time now.

### 3. The Preference Period—Deprizio and the $250,000 Payment

AEG's $1,810,000 payment was made to Zenith within 90 days before AEG filed bankruptcy. It thus comes within the 90–day preference period established by Bankruptcy Code § 547(b)(4)(A). However, AEG's $250,-000 payment to Zenith was made more than 90 days, but less than one year before AEG filed its petition. Therefore, unless the preference period is extended from the regular 90–day period to the one-year period for insiders, 11 U.S.C. § 547(b)(4)(B), the $250,-000 payment is not a preference.

▇▇ The trial court invoked the so called "*Deprizio*" doctrine to extend the preference period to one year from the date of AEG's bankruptcy, thereby bringing the $250,000 payment within the parameters of a preference. This doctrine arises from the Seventh Circuit's decision in *Levit v. Ingersoll Rand Financial Corp. (In re V.N. Deprizio Constr. Co.),* 874 F.2d 1186 (7th Cir.1989). Under *Deprizio,* a payment made to a non-insider creditor outside the 90–day preference period may nevertheless be held to be a preference if the payment benefits an insider.

▇▇ Zenith argues that the trial court should not have applied *Deprizio* in the case at bar because the insider which allegedly received the benefit is a co-obligor, not a guarantor. Zenith asserts that KVC's right to indemnification is uncertain and, in fact, may be non-existent.[7] Because the rationale underlying *Deprizio* is that the benefited insider is a contingent creditor of the debtor, Zenith argues that it should not apply to the case at bar where the contingent liability is uncertain.

In *Deprizio,* the debtor made a payment to a non-insider lender more than 90 days, but less than one year before filing bankruptcy. The payment was made on an obligation that had been guaranteed by an insider of the debtor. The trustee sought to avoid the payment, reasoning that the guarantor was a contingent creditor of the debtor because he would have a claim against the debtor if he had to honor the guarantee. The insider-guarantor benefitted from the transfer by having his potential liability on the guarantee reduced. Moreover, the trustee could collect from the lender because under Bankruptcy Code § 550(a) a preference may be recovered not only from the benefitted party (the insider), but from the initial transferee of the transfer (the lender). The bankruptcy court held for the lender and denied recovery for the trustee, but the district court reversed and the Seventh Circuit affirmed the district court, agreeing with the trustee's analysis.

All of the federal circuit courts of appeal that have addressed this issue have followed *Deprizio. In re T.B. Westex Foods, Inc.,* 950 F.2d 1187 (5th Cir.1992); *In re C–L Cartage Co.,* 899 F.2d 1490 (6th Cir.1990); *In re Robinson Bros. Drilling, Inc.,* 892 F.2d 850 (10th Cir.1989) (summarily affirming district court decision that applied *Deprizio* ). *See also In re Erin Food Services, Inc.,* 980 F.2d 792 (1st Cir.1992) (assuming without deciding that *Deprizio* correctly analyzes §§ 547 and 550). Moreover, both the Ninth Circuit Court of Appeals and the Panel have recently adopted *Deprizio. See In re Suffola,* 2 F.3d

---

7. Zenith also argues that there was no evidence presented that the $250,000 reduced KVC's liability or that KVC was an insider. We disagree. There is no dispute that KVC was an insider of AEG. The Agreement itself states that AEG is a wholly-owned subsidiary of KVC. Thus, Zenith's complaint that the trial court did not find that KVC was an insider of AEG is wrong.

Moreover, both KVC and AEG were obligated to make the various payments called for by the Agreement. Zenith fails to illustrate how the payments could have been "applied" such that they did not benefit KVC by reducing the amount it owed Zenith.

0

0

977 (9th Cir.1993); *In re Skywalker*, 155 B.R. 526 (9th Cir. BAP 1993). We follow these cases and affirm the trial court's decision to apply *Deprizio* analysis here.

#### 4. Liquidation Analysis—Zenith's Secured Status

The trial court held that Zenith received more by virtue of the payments than it would have in a liquidation because it was an unsecured creditor. The court reasoned that Zenith had not properly perfected its security interests in the Films and that, even if it had, the security interests were preferences. Zenith argues that it held valid security interests in the Films and that it did not receive more by virtue of the payments than it would have in a liquidation.

##### a. Improper Perfection of Foreign Films

The trial court determined that Zenith had failed to perfect its security interests in the foreign Films because the Films had not been registered with the United States Copyright Office. Zenith argues that the court erred because, under the Berne Convention for the Protection of Literary and Artistic Works (Paris Text 1971) ("Berne Convention"), registration is a prohibited formality.

Under United States law, recording a document in the Copyright Office gives all persons constructive notice of the information contained in the document only if the document identifies the work to which it relates and the work is registered. 17 U.S.C. § 205(c). The Berne Convention provides that authors of foreign works enjoy the same protections of any member country as do nationals of that country. Berne Convention, Art. 5(1). In addition, authors of Berne Convention works are entitled to copyright protections without complying with formalities. Berne Convention, Art. 5(2); *AEG Acquisition*, 127 B.R. at 42.

Zenith argues that requiring registration is a "formality" which may not be imposed on a Berne Convention work. Zenith points out that registration is not a prerequisite to the bringing of an infringement action for a Berne Convention work, while it is a prerequisite for a work not covered by the Berne Convention. 17 U.S.C. § 411. Zenith asserts that registration as a prerequisite to perfecting a security interest in a foreign film is a similarly prohibited formality.

As the trial court here noted, however, United States law provides no other exemptions for Berne Convention works. 127 B.R. at 42. Moreover, 17 U.S.C. § 205, which deals with recordation of transfers of copyrights, makes no distinction between foreign and domestic works. We therefore hold that Zenith's failure to register the two foreign Films before AEG filed bankruptcy defeats its attempt to perfect its security interest in the copyrights.

##### b. Preferences under § 547(e)(2)

The trial court held that even if Zenith had properly perfected its security interests in the Films, the security interests were themselves avoidable as preferences and Zenith was an unsecured creditor of AEG. The court reasoned as follows regarding the security interests: (1) They were transfers of AEG's property; (2) they benefited Zenith; (3) they were made on account of the existing $6 million debt; (4) they were perfected while AEG was insolvent; (5) they were perfected within the relevant preference period; and (6) Zenith got more as a result of the transfers than if the transfers had not been made because it is a secured creditor as a result of the transfer.

Section 547(e)(2) provides that, for purposes of § 547, a transfer occurs:

(A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 10 days after, such time;

(B) at the time the transfer is perfected, if such transfer is perfected after 10 days; or

(C) immediately before the date of the filing of the [bankruptcy] petition, if such transfer is not perfected at the later of—

(i) the commencement of the case; or

(ii) 10 days after such transfer takes effect between the transferor and the transferee.

Zenith neither filed its UCC–1 financing statements nor recorded its copyright mort-

gages until more than ten days after the security interests were created; the earliest of these was filed on March 13, 1989 and the Restructuring Agreement and all other documents were signed on or before February 28, 1989. Under this theory, therefore, the perfection of the security interests is not deemed to have occurred simultaneously with the creation of the debt (i.e. the execution of the Restructuring Agreement) as § 547(e)(2) would otherwise provide. The security interests are thus not insulated from being treated as preferences under § 547(e)(2).

Zenith responds that § 547(e) does not, *ipso facto*, invalidate any security interest not perfected within ten days of when it was granted. This argument, however, ignores the balance of the discussion above. Section 547(e) is only relevant here to address the antecedent debt element of a preference. The other elements, are satisfied in this case and the security interests in the Films were therefore properly avoided (subject to application of the *Deprizio* doctrine).

### 5. New Value Defense

■ Bankruptcy Code § 547(c)(1) provides that the trustee may not avoid an otherwise preferential transfer if the transfer was intended by the debtor and the creditor to be a contemporaneous exchange for new value given to the debtor and if it was in fact a substantially contemporaneous exchange. Zenith argues that the payments made to it by AEG were in return for it providing AEG with distribution rights that it did not previously have. Thus, the contemporaneous exchange defense insulates the transfers.

The trial court rejected this argument on the ground that AEG already had possession of the Films and the right to exploit them when the Restructuring Agreement was executed. The court noted that during the pendency of the bankruptcy, AEG had exploited one of the Films over the objections of Zenith. 127 B.R. at 40 n. 3. The court thus concluded that "the Restructuring Agreement in substance accomplished a restructuring of the debt, and did not pass new value to AEG to support the payments to Zenith." *Id.* at 40.

Because we agree with the trial court that the Restructuring Agreement is a conditional sale arrangement, AEG had possession and the right to distribute the Films from the execution of the contract. Accordingly, no new value passed to AEG when it made a payment; payments were merely retirement of the $6 million debt.

### B. The Strong Arm Clause and Unperfected Security Interest

■ Zenith further argues the strong arm powers provided to the debtor under Bankruptcy Code § 544(a)(1) do not permit it take priority over Zenith's unperfected copyright mortgage. The trial court relied on *In re Peregrine Entertainment, Ltd.*, 116 B.R. 194 (C.D.Cal.1990), to find to the contrary. In *Peregrine*, the court specifically found that a debtor-in-possession using the strong arm powers of § 544 (as defined under California judgment lien law) would prevail over the holder of an unperfected copyright mortgage. *Peregrine* is well reasoned and on point. Zenith presents no sound reason to vary from *Peregrine*'s analysis or holding.

### C. Executory Nature of Contract

■ The final remaining issue is whether the Restructuring Agreement is an executory contract. This issue does not impact the foregoing preference issues, but it does determine whether AEG must assume the Restructuring Agreement pursuant to Bankruptcy Code § 365. Section 365 requires, *inter alia*, prompt cure of any defaults and adequate assurance that it will be able to perform in the future. *See* 11 U.S.C. § 365(b)(1).

The trial court denied Zenith's motion to compel AEG to assume or reject the Restructuring Agreement because it held that the Agreement is not an executory contract. The court reached this conclusion because it found that "Zenith's only remaining obligations are those of a secured or unsecured creditor. Where the seller has already delivered the subject of the transfer, and the principal remaining obligation between the parties is the purchaser's obligation to pay, a contract is not executory." 127 B.R. at 45

(citing *In re Pacific Express, Inc.*, 780 F.2d 1482 (9th Cir.1986)).

Zenith asserts that the court erred in so holding because substantial obligations remained for each party under the Restructuring Agreement. The focus of Zenith's argument is that the trial court erred in relying on *Pacific Express* in reaching its conclusion. Instead, Zenith claims that the court should have looked for guidance to *In re Qintex Entertainment, Inc.*, 950 F.2d 1492 (9th Cir. 1991), which, it argues, mandates a conclusion that the Restructuring Agreement is executory. We agree that *Qintex* is similar to the case at bar in some respects. But we disagree that *Qintex* mandates reversal of the trial court's holding that the Restructuring Agreement is not an executory contract.

*Qintex* dealt with an agreement for the colorization and distribution of four Films. The debtor, Qintex Entertainment, Inc., was to pay the film owner, Otto Preminger Films, Ltd., $1 million, plus a percentage of gross receipts in return for the rights to colorize and distribute the Films for about 24 years. Qintex was also obligated to provide quarterly accountings to Preminger whose obligations were to refrain from selling the rights to subdistribute the movies, to indemnify and defend Qintex and to exercise creative control over the colorization and marketing of the Films. *Id.* at 1496.

After colorizing two of the Films, the debtor defaulted under the contract and subsequently filed bankruptcy. *Id.* at 1493–1494. The district court held that the agreement was not an executory contract and thus did not need to be assumed before it could be sold as an asset of the estate. *Id.* at 1494.

The Ninth Circuit reversed. The court noted that an executory contract is one in which the obligations of the parties are so far unperformed "that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other.'" *Id.* at 1495 (quoting *In re Wegner,* 839 F.2d 533, 536 (9th Cir. 1988)). Thus, unless both parties still have material obligations that remain unperformed, the contract is not executory. The court then concluded that Preminger's remaining obligations (listed above) were suffi-ciently material that the agreement was executory.

Zenith argues that applying *Qintex* to the case at bar yields the same result. We disagree. First, the agreement in *Qintex* not only involved the sale of distribution rights, but also involved colorization and marketing of the Films over which Preminger was to retain creative control. In the instant case, by contrast, the Restructuring Agreement involves only the sale of distribution rights for the Films and execution of documents and reports incident thereto. The Restructuring Agreement does not contemplate an ongoing relationship regarding creative work on the Films as in *Qintex.*

Second, the Restructuring Agreement states that AEG's failure to perform its obligations (i.e. payment of the installments) constitutes a default that permits Zenith to exercise various remedies, including collection on the confessions of judgment. The Restructuring Agreement, however, does not mention any failure to perform by Zenith as constituting a default. In particular, the Restructuring Agreement does not mention any of the remaining "material obligations" Zenith claims to have left to perform as a default.

Finally, the nature of the Restructuring Agreement is, as discussed above, a conditional sales agreement. The copyright owner, Zenith, sold AEG a license to distribute the Films in certain markets for $6 million and took a security interest in the Films to secure payment. We note that at least one commentator has squarely addressed this issue:

> Copyright assignments and licenses should not be treated as executory contracts.... According to the Copyright Act, assignments and licenses are transfers of copyright ownership; bankruptcy courts should treat them that way. If a debtor has granted an assignment or exclusive license of its copyright rights prior to filing bankruptcy, the assignment or exclusive license should be treated as a completed prebankruptcy transfer of property by the debtor, not as an executory contract.... Conversely, if a debtor enters bankruptcy with

valid copyright assignments or exclusive licenses of copyright rights owned by others, those assignments or exclusive licenses are property of the estate, not executory contracts.

J. Brinson, *The Copyright Act and Bankruptcy: Perfection, Priorities, and Transfers,* 1 J.Bankr.Law and Practice 337, 353 (1992) (footnotes omitted). We agree with this analysis. Absent an anticipated ongoing relationship between the parties, as in *Qintex,* a transfer of a copyright should be treated like any other transfer of a property interest. Accordingly, we affirm the trial court's holding that the Restructuring Agreement is not an executory contract.

### CONCLUSION

Based upon the foregoing, we AFFIRM the trial court's decision.