303 F.3d 1120
 In re WORLD AUXILIARY POWER COMPANY;
In re World, Aerotechnology Corporation;
In re Air Refrigeration Systems, Inc., Debtors,
Aerocon Engineering, Inc., Appellant,
v.
Silicon Valley Bank; Advanced Aerospace LLC; Airweld, Inc.; Michael Gilsen; Merritt Widen; World Auxiliary Power Company; World Aerotechnology Corporation; Air Refrigeration, Inc., Appellees.
 No. 00-16550.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 7, 2001.
 Filed September 11, 2002.
 
 COPYRIGHT MATERIAL OMITTED Jerrold K. Guben (argued), Reinwald O'Connor & Playdon, Honolulu, Hawaii, and Steven N. Kurtz (briefed), Greenberg & Bass, Encino, California, for the appellant.
 Shawn M. Christianson, Buchalter, Nemer, Fields & Younger, San Francisco, California, for appellee Silicon Valley Bank.
 Craig K. Welch, Welch & Olrich, Petaluma, California, for appellees Advanced Aerospace LLC, Airweld, Inc., and Michael Gilsen.
 Robert L. Eisenbach III (briefed), Cooley Godward LLP, San Francisco, California, for amici curiae California Bankers Association, GATX Capital Corporation, Greater Bay Bancorp, and Imperial Bank.
 Appeal from the United States District Court for the Northern District of California; William H. Alsup, District Judge, Presiding. D.C. No. CV-00-00571-WHA.
 Before BRUNETTI, KLEINFELD and THOMAS, Circuit Judges.
 OPINION
 KLEINFELD, Circuit Judge:
 
 
 1
 In this case we decide whether federal or state law governs priority of security interests in unregistered copyrights.
 
 FACTS
 
 2
 Basically, this is a bankruptcy contest over unregistered copyrights between a bank that got a security interest in the copyrights from the owners and perfected it under state law, and a company that bought the copyrights from the bankruptcy trustees after the copyright owners went bankrupt. These simple facts are all that matters to the outcome of this case, although the details are complex.
 
 
 3
 Three affiliated California corporations — World Auxiliary Power, World Aerotechnology, and Air Refrigeration Systems — designed and sold products for modifying airplanes. The FAA must approve modifications of civilian aircraft by issuing "Supplemental Type Certificates."[1] The three companies owned copyrights in the drawings, technical manuals, blueprints, and computer software used to make the modifications. Some of these copyrighted materials were attached to the Supplemental Type Certificates. The companies did not register their copyrights with the United States Copyright Office.[2]
 
 
 4
 The companies got financing from Silicon Valley Bank, one of the appellees in this case. Two of the companies borrowed the money directly, the third guaranteed the loan. The security agreement, as is common, granted the bank a security interest in a broad array of presently owned and after-acquired collateral. The security agreement covered "all goods and equipment now owned or hereafter acquired," as well as inventory, contract rights, general intangibles, blueprints, drawings, computer programs, accounts receivable, patents, cash, bank deposits, and pretty much anything else the debtor owned or might be "hereafter acquired." The security agreement and financing statement also covered "[a]ll copyright rights, copyright applications, copyright registrations, and like protections in each work of authorship and derivative work thereof, whether published or unpublished, now owned or hereafter acquired."
 
 
 5
 The bank perfected its security interest in the collateral, including the copyrights, pursuant to California's version of Article 9 of the Uniform Commercial Code,[3] by filing UCC-1 financing statements with the California Secretary of State.[4] The bank also took possession of the Supplemental Type Certificates and the attached copyrighted materials. But the copyrights still weren't registered with the United States Copyright Office,[5] and the bank did not record any document showing the transfer of a security interest with the Copyright Office.[6]
 
 
 6
 Subsequently, the three debtor companies filed simultaneous but separate bankruptcy proceedings. Their copyrights were among their major assets. Aerocon Engineering, one of their creditors (and the appellant in this case), wanted the copyrights. Aerocon was working on a venture with another company, Advanced Aerospace, and its President, Michael Gilsen, and an officer and director, Merritt Widen (all appellees in this case), to engineer and sell aircraft modifications using the debtors' designs. Their prospective venture faced a problem: Silicon Valley Bank claimed a security interest in the copyrights. To solve this problem, Aerocon worked out a deal with Gilsen, Widen, and a company named Erose Capital (not a party in this case) to buy the debtors' assets, including their copyrights, from the bankruptcy trustees along with the trustees' right to sue to avoid Silicon Valley Bank's security interest. Once Aerocon owned the copyrights, it planned to exercise the trustees' power to avoid Silicon Valley Bank's security interest[7] so that the venture would own the copyrights free and clear.
 
 
 7
 The transaction to purchase the copyrights and the trustees' avoidance action worked as follows. First, Aerocon paid the bankruptcy trustees $90,000, $30,000 for each of the three bankruptcy estates. Then, the trustees, with the bankruptcy court's approval, sold the estates' assets and avoidance action to Erose Capital, Gilsen, and Widen. Gilsen and Widen then sold their two-thirds interest to their company, Advanced Aerospace.
 
 
 8
 After this transaction was completed, for reasons not relevant to this appeal, Aerocon's planned joint venture with Advanced Aerospace and Gilsen and Widen fell through. In the aftermath, Erose Capital sold its one-third interest to Aerocon and Advanced Aerospace sold its two-thirds interest to Airweld. These transactions meant that Aerocon and Airweld owned the debtors' copyrights and the trustees' avoidance action as tenants in common.
 
 
 9
 Meanwhile, Silicon Valley Bank won relief from the bankruptcy court's automatic stay and, based on its security interest, foreclosed on the copyrights. Then the bank sold the copyrights to Advanced Aerospace (Gilsen's and Widen's company) which then sold the copyrights to Airweld. Had Aerocon's joint venture with Gilsen and Widen gone through, buying off the trustees' and the bank's interests in the copyrights would have been a sensible, if expensive, way to ensure that the venture owned the copyrights free and clear. But, of course, the venture did not go through, and Gilsen and Widen's affiliations had changed. Thus Gilsen and Widen's purchase from the bank and sale to Airweld meant that Aerocon, which had paid $90,000 for the copyrights and had owned them as a tenant in common with Airweld, now had a claim adverse to Airweld's, which purportedly owned the copyrights in fee simple.
 
 
 10
 Aerocon brought an adversary proceeding in each of the three bankruptcy proceedings against Silicon Valley Bank, Advanced Aerospace, Gilsen, Widen, and Airweld. (These adversary proceedings were later consolidated.) Aerocon sued to avoid Silicon Valley Bank's security interest[8] and to recover the copyrights or their value from subsequent transferees Advanced Aerospace, Gilsen, Widen, and Airweld.[9] The bankruptcy court granted the subsequent transferees' motion to dismiss Aerocon's claims against them as time-barred.[10] The bankruptcy court then granted summary judgment to Silicon Valley Bank on all of Aerocon's claims on the ground that the bank had perfected its security interest in the copyrights under California's version of Article 9 of the Uniform Commercial Code.[11] Aerocon appealed to the Ninth Circuit Bankruptcy Appellate Panel. Silicon Valley Bank objected, and the appeal was transferred to the district court,[12] which affirmed the bankruptcy court. Aerocon appeals from the district court's order.
 
 ANALYSIS
 
 11
 We have jurisdiction to review the judgment of the district court[13] and we review de novo.[14]
 
 
 12
 Copyright and bankruptcy law set the context for this litigation, but the legal issue is priority of security interests. The bankruptcy trustees sold Aerocon their power to avoid any security interest "that is voidable by a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien...."[15] Under this "strong-arm" provision, Aerocon has the status of an "ideal creditor" who perfected his lien at the last possible moment before the bankruptcy commenced,[16] and if this hypothetical creditor would take priority over Silicon Valley Bank's lien, then Aerocon may avoid the bank's security interest.
 
 
 13
 Whether Aerocon's hypothetical lien creditor would take priority turns on whether federal or state law governs the perfection of security interests in unregistered copyrights. The bank did everything necessary to perfect its security interest under state law, so if state law governs, the bank has priority and wins. The bank did nothing, however, to perfect its interest under federal law, so if federal law governs, Aerocon's hypothetical lien creditor arguably has priority, although the parties dispute whether Aerocon might face additional legal hurdles.
 
 
 14
 We are assisted in deciding this case by two opinions, neither of which controls, but both of which are thoughtful and scholarly. The first is the bankruptcy court's published opinion in this case, Aerocon Engineering Inc. v. Silicon Valley Bank (In re World Auxiliary Power Co.),[17] which we affirm largely for the reasons the bankruptcy judge gave. The second is a published district court opinion, National Peregrine, Inc. v. Capitol Federal Savings & Loan Association (In re Peregrine Entertainment, Ltd.),[18] the holdings of which we adopt but, like the bankruptcy court, distinguish and limit.
 
 
 15
 Our analysis begins with the Copyright Act of 1976.[19] Under the Act, "copyright protection subsists ... in original works of authorship fixed in any tangible medium of expression...."[20] While an owner must register his copyright as a condition of seeking certain infringement remedies,[21] registration is permissive, not mandatory, and is not a condition for copyright protection.[22] Likewise, the Copyright Act's provision for recording "transfers of copyright ownership"[23] (the Act's term that includes security interests)[24] is permissive, not mandatory: "Any transfer of copyright ownership or other document pertaining to copyright may be recorded in the Copyright Office...."[25] The Copyright Act's use of the word "mortgage" as one definition of a "transfer"[26] is properly read to include security interests under Article 9 of the Uniform Commercial Code.[27]
 
 
 16
 Under the Copyright Act,
 
 
 17
 [a]s between two conflicting transfers, the one executed first prevails if it is recorded, in the manner required to give constructive notice ... within one month after its execution ... or at any time before recordation ... of the later transfer. Otherwise the later transfer prevails if recorded first in such manner, and if taken in good faith, for valuable consideration ... and without notice of the earlier transfer.[28]
 
 
 18
 The phrase "constructive notice" refers to another subsection providing that recording gives constructive notice
 
 
 19
 but only if —
 
 
 20
 (1) the document, or material attached to it, specifically identifies the work to which it pertains so that, after the document is indexed by the Register of Copyrights, it would be revealed by a reasonable search under the title or registration number of the work; and
 
 
 21
 (2) registration has been made for the work.[29]
 
 
 22
 A copyrighted work only gets a "title or registration number" that would be revealed by a search if it's registered.[30] Since an unregistered work doesn't have a title or registration number that would be "revealed by a reasonable search," recording a security interest in an unregistered copyright in the Copyright Office wouldn't give "constructive notice" under the Copyright Act, and, because it wouldn't, it couldn't preserve a creditor's priority. There just isn't any way for a secured creditor to preserve a priority in an unregistered copyright by recording anything in the Copyright Office. And the secured party can't get around this problem by registering the copyright, because the secured party isn't the owner of the copyright, and the Copyright Act states that only "the owner of copyright ... may obtain registration of the copyright claim...."[31]
 
 
 23
 Aerocon argues that the Copyright Act's recordation and priority scheme exclusively controls perfection and priority of security interests in copyrights. First, Aerocon argues that state law, here the California U.C.C., by its own terms "steps back" and defers to the federal scheme. Second, whether or not the U.C.C. steps back, Aerocon argues that Congress has preempted the U.C.C. as it applies to copyrights. We address each argument in turn.
 
 A. U.C.C. Step Back Provisions
 
 24
 Article 9 of the Uniform Commercial Code, as adopted in California, provides that unperfected creditors are subordinate to perfected, and as between perfected security interests, the first perfected interest prevails.[32] The bank perfected first under state law by filing a financing statement with the California Secretary of State on existing and after-acquired copyrights. The U.C.C. treats copyrights as "general intangibles."[33] Security interests in general intangibles are properly perfected under the U.C.C. by state filings such as the one made by the bank in this case.[34]
 
 
 25
 To avoid conflict with the federal law, the U.C.C. has two "step-back provisions," by which state law steps back and out of the way of conflicting federal law. The first, more general "step-back" provision says that Article 9 "does not apply ... [t]o a security interest subject to any statute of the United States to the extent that such statute governs the rights of parties to and third parties affected by transactions in particular types of property...."[35] As applied to copyrights, the relevant U.C.C. Official Comment makes it clear that this step-back clause does not exclude all security interests in copyrights from U.C.C. coverage, just those for which the federal Copyright Act "governs the rights" of relevant parties:
 
 
 26
 Although the Federal Copyright Act contains provisions permitting the mortgage of a copyright and for the recording of an assignment of a copyright such a statute would not seem to contain sufficient provisions regulating the rights of the parties and third parties to exclude security interests in copyrights from the provisions of this Article.[36]
 
 
 27
 The second step-back provision[37] speaks directly to perfection of security interests. It exempts from U.C.C. filing requirements security interests in property "subject to ... [a] statute ... of the United States which provides for a national ... registration ... or which specifies a place of filing different from that specified in this division for filing of the security interest."[38] Compliance with such a statute "is equivalent to the filing of a financing statement ... and a security interest in property subject to the statute ... can be perfected only by compliance therewith...."[39]
 
 
 28
 Under the U.C.C.'s two step-back provisions, there can be no question that, when a copyright has been registered, a security interest can be perfected only by recording the transfer in the Copyright Office. As the district court held in Peregrine,[40] the Copyright Act satisfies the broad U.C.C. step-back provision by creating a priority scheme that "governs the rights of parties to and third parties affected by transactions"[41] in registered copyrights and satisfies the narrow step-back provision by creating a single "national registration"[42] for security interests in registered copyrights. Thus, under these step-back provisions, if a borrower's collateral is a registered copyright, the secured party cannot perfect by filing a financing statement under the U.C.C. in the appropriate state office, or alternatively by recording a transfer in the Copyright Office. For registered copyrights, the only proper place to file is the Copyright Office. We adopt Peregrine's holding to this effect.[43]
 
 
 29
 However, the question posed by this case is whether the U.C.C. steps back as to unregistered copyrights. We, like the bankruptcy court in this case,[44] conclude that it does not. As we've explained, there's no way for a secured creditor to perfect a security interest in unregistered copyrights by recording in the Copyright Office. The U.C.C.'s broader step-back provision says that the U.C.C. doesn't apply to a security interest "to the extent" that a federal statute governs the rights of the parties.[45] The U.C.C. doesn't defer to the Copyright Act under this broad step-back provision because the Copyright Act doesn't provide for the rights of secured parties to unregistered copyrights; it only covers the rights of secured parties in registered copyrights. The U.C.C.'s narrow step-back provision says the U.C.C. doesn't apply if a federal statute "provides for a national ... registration ... or which specifies a place of filing different from that specified in this division for filing of the security interest."[46] The U.C.C. doesn't defer to the Copyright Act under this narrow step-back provision because the Copyright Act doesn't provide a "national registration": unregistered copyrights don't have to be registered, and because unregistered copyrights don't have a registered name and number, under the Copyright Act there isn't any place to file anything regarding unregistered copyrights that makes any legal difference. So, as a matter of state law, the U.C.C. doesn't step back in deference to federal law, but governs perfection and priority of security interests in unregistered copyrights itself.
 
 B. Federal Preemption
 
 30
 It wouldn't matter that state law doesn't step back, however, if Congress chose to knock state law out of the way by preemption. Federal law preempts state law under three circumstances. The first is "express preemption," where Congress explicitly preempts state law.[47] The second is "field preemption," where Congress implicitly preempts state law by "occupy[ing] the entire field, leaving no room for the operation of state law"[48] The third is "conflict preemption," where we infer preemption because "compliance with both state and federal law would be impossible, or state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[49] We presume that federal law does not preempt "state law in areas traditionally regulated by the States."[50]
 
 
 31
 Aerocon argues, relying on Peregrine, that Congress intended to occupy the field of security interests in copyrights. Aerocon also argues that the U.C.C. actually conflicts with the Copyright Act's text and purpose.
 
 
 32
 Because Aerocon relies so heavily on Peregrine and its progeny, we will briefly review the facts and holding of that case. In Peregrine, a bank had secured a loan with the debtor's copyrights in a library of films licensed out for exhibition and related accounts receivable and attempted to perfect its security interest by filing a U.C.C. financing statement.[51] The debtor later filed for bankruptcy and, as debtor-in-possession, sued in the bankruptcy court to avoid the bank's lien on the ground that the bank had failed to perfect its lien by failing to record it with the Copyright Office.[52] The bankruptcy court held for the bank, and the debtor-in-possession appealed to the district court. The district court reversed, holding that "the comprehensive scope of the Copyright Act's recording provisions, along with the unique federal interests they implicate, support the view that federal law preempts state methods of perfecting security interests in copyrights...."[53] The district court reasoned that federal law preempts state law because "the Copyright Act establishes a uniform method for recording security interests in copyrights"[54] and creates a different priority scheme than state law,[55] and because "competing recordation schemes ... lessen[] the utility of each."[56]
 
 
 33
 Although Peregrine did not specify whether the copyrights at issue were registered, it is probably safe to assume that they were, and that the Peregrine court did not have a case involving unregistered copyrights, because the collateral at issue was a movie library that got licensed out to exhibitors[57] and, in the ordinary course, copyrights in such films would be registered. Also, as the bankruptcy judge in the case at bar pointed out, Peregrine's "analysis only works if the copyright was registered."[58] The district court in Peregrine held that Congress had preempted state law because of "the comprehensive scope of the Copyright Act's recording provisions."[59] As applied to registered copyrights, the Act's recording scheme is comprehensive; it doesn't exclude any registered copyright from its coverage. But as applied to unregistered copyrights, the Act doesn't have comprehensive recording provisions. Likewise, Peregrine notes that "[t]o the extent there are competing recordation schemes, this lessens the utility of each."[60] This holds true for registered copyrights. But there aren't two competing filing systems for unregistered copy-rights. The Copyright Act doesn't create one. Only the U.C.C. creates a filing system applicable to unregistered copyrights. Peregrine reasoned that creditors could get conflicting results under the U.C.C. and the Copyright Act, because each provides a different priority scheme.[61] That's true only for registered copyrights. The Copyright Act wouldn't provide a conflicting answer as to unregistered copyrights because it wouldn't provide any answer at all. Peregrine's holding applies to registered copyrights, and we adopt it, but as the bankruptcy court reasoned in the case at bar,[62] it does not apply to unregistered copyrights.
 
 
 34
 We accordingly reject two other lower court opinions, Zenith Productions, Ltd. v. AEG Acquisition Corp. (In re AEG Acquisition Corp.)[63] and In re Avalon Software Inc.,[64] that extended Peregrine's holding to unregistered copyrights.[65] No circuit court has come to that erroneous conclusion.[66] In both cases, the courts held that security interests in unregistered copyrights may not be perfected under the U.C.C.; perfection could be obtained only by registering the copyrights and recording the security interest with the Copyright Office.[67] We reject these opinions because they miss the point made by the bankruptcy judge in this case, and discussed above, that Peregrine's analysis doesn't work if it's applied to security interests in unregistered copyrights.[68] Moreover, such extensions of Peregrine to unregistered copyrights would make registration of copyright a necessary prerequisite of perfecting a security interest in a copyright.[69] The implication of requiring registration as a condition of perfection is that Congress intended to make unregistered copyrights practically useless as collateral, an inference the text and purpose of the Copyright Act do not warrant.
 
 
 35
 In the one instance where the Copyright Act conditions some action concerning a copyright on its registration — the right to sue for infringement — the Act makes that condition explicit.[70] Nowhere does the Copyright Act explicitly condition the use of copyrights as collateral on their registration. Second, the Copyright Act contemplates that most copyrights will not be registered. Since copyright is created every time people set pen to paper, or fingers to keyboard, and affix their thoughts in a tangible medium,[71] writers, artists, computer programmers, and web designers would have to have their hands tied down to keep them from creating unregistered copyrights all day every day. Moreover, the Copyright Act says that copyrights "may" be registered,[72] implying that they don't have to be, and since a fee is charged[73] and time and effort is required, the statute sets up a regime in which most copyrights won't ever be registered.
 
 
 36
 Though Congress must have contemplated that most copyrights would be unregistered, it only provided for protection of security interests in registered copyrights. There is no reason to infer from Congress's silence as to unregistered copyrights an intent to make such copyrights useless as collateral by preempting state law but not providing any federal priority scheme for unregistered copyrights. That would amount to a presumption in favor of federal preemption, but we are required to presume just the opposite.[74] The only reasonable inference to draw is that Congress chose not to create a federal scheme for security interests in unregistered copyrights, but left the matter to States, which have traditionally governed security interests.
 
 
 37
 For similar reasons, we reject Aerocon's argument that congressional intent to preempt can be inferred from conflict between the Copyright Act and the U.C.C. There is no conflict between the statutory provisions: the Copyright Act doesn't speak to security interests in unregistered copyrights, the U.C.C. does.
 
 
 38
 Nor does the application of state law frustrate the objectives of federal copyright law. The basic objective of federal copyright law is to "promote the Progress of Science and useful Arts"[75] by "establishing a marketable right to the use of one's expression" and supplying "the economic incentive to create and disseminate ideas."[76] Aerocon argues that allowing perfection under state law would frustrate this objective by injecting uncertainty in secured transactions involving copyrights. Aerocon conjures up the image of a double-crossing debtor who, having gotten financing based on unregistered copyrights, registers them, thus triggering federal law, and gets financing from a second creditor, who then records its interest with the Copyright Office and takes priority. We decline to prevent this fraud by drawing the unreasonable inference that Congress intended to render copyrights useless as collateral unless registered.
 
 
 39
 Prudent creditors will always demand that debtors disclose any copyright registrations and perfect under federal law and will protect themselves against subsequent creditors gaining priority by means of covenants and policing mechanisms. The several amici banks and banking association in this case argue that most lenders would lend against unregistered copyrights subject to the remote risk of being "primed" by subsequent creditors; but no lender would lend against unregistered copyrights if they couldn't perfect their security interest. As we read the law, unregistered copyrights have value as collateral, discounted by the remote potential for priming. As Aerocon reads the law, they would have no value at all.
 
 
 40
 Aerocon's argument also ignores the special problem of copyrights as after-acquired collateral. To use just one example of the multi-industry need to use after-acquired (really after-created) intangible intellectual property as collateral, now that the high-tech boom of the 1990s has passed, and software companies don't attract equity financing like tulips in seventeenth century Holland,[77] these companies will have to borrow more capital. After-acquired software is likely to serve as much of their collateral. Like liens in any other after-acquired collateral, liens in after-acquired software must attach immediately upon the creation of the software to satisfy creditors. Creditors would not tolerate a gap between the software's creation and the registration of the copyright. If software developers had to register copyrights in their software before using it as collateral, the last half hour of the day for a software company would be spent preparing and mailing utterly pointless forms to the Copyright Office to register and record security interests. Our reading of the law "promote[s] the Progress of Science and useful Arts" by preserving the collateral value of unregistered copyrights, which is to say, the vast majority of copyrights. Aerocon's reading of the law — which would force producers engaged in the ongoing creation of copyrightable material to constantly register and update the registrations of their works before obtaining credit — does not.
 
 CONCLUSION
 
 41
 Regarding perfection and priority of security interests in unregistered copyrights, the California U.C.C. has not stepped back in deference to federal law, and federal law has not preempted the U.C.C. Silicon Valley Bank has a perfected security interest in the debtors' unregistered copyrights, and Aerocon, standing in the bankruptcy trustees' shoes, cannot prevail against it.
 
 
 42
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 See, generally, G.S. Rasmussen & Assoc., Inc. v. Kalitta Flying Service, Inc., 958 F.2d 896, 898-99 (9th Cir.1992) (explaining the role of Supplemental Type Certificates in FAA approval of aircraft modifications).
 
 
 [2]
 See 17 U.S.C. §§ 408-410 (2000).
 
 
 [3]
 See Cal. Comm. Code §§ 9101 et seq. (1990). Although California adopted the revised Article 9 of the Uniform Commercial Code, effective July 1, 2001, see id. §§ 9101 et seq. (2002), the revised statute "does not affect an action, case, or proceeding commenced before July 1, 2001," id. § 9702(c) (2002). As this litigation was pending on that date, we apply the former Article 9.
 
 
 [4]
 See id. §§ 9302(1), 9401(1).
 
 
 [5]
 See 17 U.S.C. § 408.
 
 
 [6]
 See id. § 205.
 
 
 [7]
 See 11 U.S.C. § 544(a) (2000).
 
 
 [8]
 See 11 U.S.C. § 544(a).
 
 
 [9]
 See id. § 550(a).
 
 
 [10]
 See id. § 550(f).
 
 
 [11]
 See Cal. Comm. Code §§ 9101 et seq. (1990) and note 3 supra.
 
 
 [12]
 See 28 U.S.C. § 158(a) & (c) (2000).
 
 
 [13]
 See id. § 158(d); Fed. R.App. P. 6(b).
 
 
 [14]
 In re First T.D. & Investment, Inc., 253 F.3d 520, 526 (9th Cir.2001); In re DeRoche, 287 F.3d 751, 755 (9th Cir.2002).
 
 
 [15]
 See 11 U.S.C. § 544(a).
 
 
 [16]
 See 4 Collier on Bankruptcy ¶ 544.02 (Lawrence P. King ed., 15th ed. 1993).
 
 
 [17]
 244 B.R. 149 (Bankr.N.D.Cal.1999)
 
 
 [18]
 116 B.R. 194 (C.D.Cal.1990)
 
 
 [19]
 17 U.S.C. § 101et seq.
 
 
 [20]
 Id. § 102(a).
 
 
 [21]
 Id. § 411(a) ("[N]o action for infringement of the copyright in any ... work shall be instituted until registration of the copyright claim has been made...."); id. § 412 ("[N]o award of statutory damages or of attorney's fees ... shall be made for ... any infringement of copyright ... before the effective date of its registration....").
 
 
 [22]
 Id. § 408(a) ("[T]he owner of copyright ... may obtain registration of the copyright claim.... Such registration is not a condition of copyright protection.").
 
 
 [23]
 Id. §§ 101, 205(a).
 
 
 [24]
 See id. §§ 101, 201(d).
 
 
 [25]
 Id. § 205(a) (emphasis added).
 
 
 [26]
 Id. § 101 ("A `transfer of copyright ownership' is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright....").
 
 
 [27]
 See Grant Gilmore, 1 Security Interests in Personal Property § 13.3, at 415 (1965) ("The phrase `may be mortgaged' in [the Copyright Act of 1909] should be read as equivalent to `may be transferred for security.' ... A copyright would not in any case seem to be within the category of intangible property which can be pledged; under Article 9 of the [Uniform Commercial] Code it would be a `general intangible.'"). See also In re Cybernetic Services, Inc., 252 F.3d 1039, 1056 (9th Cir.2001) ("[T]he Copyright Act, by its terms, governs security interests."); National Peregrine, Inc., 116 B.R. at 199 ("It is clear ... that an agreement granting a creditor a security interest in a copyright may be recorded in the Copyright Office.").
 
 
 [28]
 17 U.S.C. § 205(d) (emphasis added)
 
 
 [29]
 Id. § 205(c) (emphasis added).
 
 
 [30]
 See id. § 409 ("The application for copyright registration shall ... include ... the title of the work...."); id. § 410(a) ("When... the Register of Copyrights determines that... the material deposited constitutes copyrightable subject matter ... the Register shall register the claim and issue ... a certificate of registration.... The certificate shall contain the information given in the application, together with the number and effective date of the registration.").
 
 
 [31]
 Id. § 408(a).
 
 
 [32]
 See Cal. Comm.Code § 9301(1) (1990) ("[A]n unperfected security interest is subordinate to the rights of ... [p]ersons entitled to priority under Section 312 ...."); id. § 9312(5)(a) ("Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made or the time the security interest is first perfected, whichever is earlier....").
 
 
 [33]
 See id. § 9106 & Official Comment ("The term `general intangible' brings under this Article miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security.... [E]xamples are copyrights, trademarks, and patents....").
 
 
 [34]
 See id. §§ 9302(1), 9401(1).
 
 
 [35]
 Cal. Comm.Code § 9104(a)
 
 
 [36]
 Id. Official Comment 1.
 
 
 [37]
 Id. § 9302(3)(a).
 
 
 [38]
 Cal. Comm.Code § 9302(3)(a)
 
 
 [39]
 Id. § 9302(4).
 
 
 [40]
 See 116 B.R. at 202-204.
 
 
 [41]
 Cal. Comm.Code § 9104(a)
 
 
 [42]
 Id. § 9302(3)(a).
 
 
 [43]
 116 B.R. at 204
 
 
 [44]
 See 244 B.R. at 155-56.
 
 
 [45]
 See Cal. Comm.Code § 9104(a).
 
 
 [46]
 Id. § 9302(3)(a).
 
 
 [47]
 Keams v. Tempe Technical Institute, Inc., 39 F.3d 222, 225 (9th Cir.1994) (internal quotation marks and citation omitted).
 
 
 [48]
 Id. at 225.
 
 
 [49]
 Id.
 
 
 [50]
 Id. (internal quotation marks and citation omitted).
 
 
 [51]
 116 B.R. at 197-98
 
 
 [52]
 Id. at 198.
 
 
 [53]
 Id. at 199.
 
 
 [54]
 Id. at 200.
 
 
 [55]
 Id. at 201.
 
 
 [56]
 Id. at 200.
 
 
 [57]
 Id. at 197.
 
 
 [58]
 Aerocon Engineering, Inc., 244 B.R. at 152.
 
 
 [59]
 National Peregrine, Inc., 116 B.R. at 199.
 
 
 [60]
 Id. at 200.
 
 
 [61]
 Id. at 201.
 
 
 [62]
 Aerocon Engineering, Inc., 244 B.R. at 152.
 
 
 [63]
 161 B.R. 50 (9th Cir.BAP 1993),affirming 127 B.R. 34 (Bankr.C.D.Cal.1991).
 
 
 [64]
 209 B.R. 517 (D.Ariz.1997)
 
 
 [65]
 See Zenith Productions, 161 B.R. at 57 (BAP), affirming 127 B.R. at 40-41 (Bankr. C.D.Cal.) (holding security interests in copyrights in films unperfected because the creditor had not registered the copyrights); In re Avalon Software Inc., 209 B.R. at 521-22 (holding security interests in existing and after-acquired software unperfected because the copyrights were not registered and the security interests were not recorded with the Copyright Office).
 
 
 [66]
 InIn re Cybernetic Services, Inc., 252 F.3d 1039 (9th Cir.2001), we held that state law governs perfection of security interests in patents. Id. at 1059. We distinguished Peregrine because the Patent Act, unlike the Copyright Act, doesn't contemplate the recordation of security interests. See id. at 1056. We neither approved nor disapproved Peregrine because patent law, not copyright law, was at issue. Id. See also Broadcast Music, Inc. v. Hirsch, 104 F.3d 1163, 1166 (9th Cir.1997) (distinguishing Peregrine on the ground that an assignment of royalties was not a "transfer" of an interest in copyright).
 
 
 [67]
 Zenith Productions, 161 B.R. at 57 (BAP), affirming 127 B.R. at 40-41 (Bankr.C.D.Cal.); In re Avalon Software Inc., 209 B.R. at 521-22.
 
 
 [68]
 See Aerocon Engineering, Inc., 244 B.R. at 152.
 
 
 [69]
 See, e.g., In re Avalon Software Inc., 209 at 521-522 ("Perfection and constructive notice to the world is accomplished by ... documenting the security interest with the U.S. Office of Copyright and ... insuring that a registration of the copyrighted product has also been made...."); Zenith Productions, 127 B.R. at 40-41 (Bankr.C.D.Cal.), affirmed at 161 B.R. at 57 (BAP) ("Perfection of a security interest in a motion picture, as in any copyright, requires two steps: the film must be registered with the United States Copyright Office, and the security interest must be recorded in the same office.").
 
 
 [70]
 See 17 U.S.C. § 411(a).
 
 
 [71]
 See id. § 102(a) ("[C]opyright protection subsists ... in original works of authorship fixed in any tangible medium of expression....").
 
 
 [72]
 Id. § 408(a) ("[T]he owner of copyright ... may obtain registration of the copyright claim.... Such registration is not a condition of copyright protection.").
 
 
 [73]
 See, generally, Copyright Office Circular 4 (2002).
 
 
 [74]
 Keams, 39 F.3d at 225 ("There is a presumption against finding pre-emption of state law in areas traditionally regulated by the States.") (internal quotation marks and citation omitted).
 
 
 [75]
 U.S. Constitution, article 1, section 8
 
 
 [76]
 Harper & Row, Publishers v. Nation Enterprises, 471 U.S. 539, 558, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).
 
 
 [77]
 See, generally, Mike Dash, Tulipomania: The Story of the World's Most Coveted Flower & the Extraordinary Passions It Aroused (2001).